952 A.2d 436

NEW JERSEY DIVISION OF YOUTH AND FAMILY
SERVICES, PLAINTIFF–RESPONDENT, v.
E.P., DEFENDANT–APPELLANT.

IN THE MATTER OF THE GUARDIANSHIP OF A.H., A MINOR.

Argued January 22, 2008—Decided July 14, 2008.

*Beatrix W. Shear,* Deputy Public Defender argued the cause for appellant E.P. (*Yvonne Smith Segars,* Public Defender, attorney; *Ms. Shear and Alison S. Perrone,* Designated Counsel, on the briefs).

*Noel C. Devlin,* Assistant Deputy Public Defender, argued the cause for appellant A.H. (*Yvonne Smith Segars,* Public Defender, attorney).

*Jessica M. Steinglass,* Deputy Attorney General, argued the cause for respondent (*Anne Milgram,* Attorney General of New Jersey, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel).

*Diana Dunker* argued the cause for amicus curiae Legal Services of New Jersey (*Melville D. Miller, Jr.*, President, attorney; *Ms. Dunker, Mr. Miller and Mary M. McManus–Smith*, on the brief).

Justice ALBIN delivered the opinion of the Court.

In this case, the Appellate Division affirmed the Family Part's termination of a mother's parental rights to her daughter, who is now almost thirteen years old. The termination was based in large part on the mother's addiction to drugs, psychological problems, and unstable lifestyle, all of which made her unfit to care for her child for most of the child's life. Her emotionally fragile and unstable daughter moved from one foster home to another, and suffered abuse on more than one occasion. There is no prospect of the daughter's adoption on the horizon.

Although mother and daughter have not lived together now for more than nine years, they have maintained a loving relationship, through periodic visits and telephone conversations. Despite the mother's manifest deficiencies, they have developed a strong emotional bond with each other.

Termination of parental rights severs all ties and contacts between a parent and a child. The object is to allow the child the opportunity for a permanent placement with a new family, where the child can grow and thrive with the end goal of adoption. However, here, permanent placement is a remote possibility, whereas severing the one and only permanent and sustaining emotional bond that the child has—her relationship with her mother—is almost certain to cause serious harm to the child, who already has threatened and attempted suicide. Since the family court's ruling, the mother has been on a rehabilitative path—free of drugs for some time, gainfully employed, and with stable housing. We cannot say, however, based on the record before us, that the mother is or will ever be fit to care for her daughter.

Nevertheless, because a permanent placement with an adoptive family is nowhere in sight and the child's only enduring emotional

and loving bond remains with her natural mother, we hold that the Family Part was clearly mistaken in finding that the best interests of the child would be served by a termination of parental rights. For those reasons, we reverse.

## I.

### A.

This case involves the lives of a mother and daughter, who have been physically separated now for nine years, but who have remained emotionally bonded to each other. We begin with the mother's story.

Emilia [1] is the mother of Andrea, who was born on July 27, 1995.[2] Three years later, Emilia suffered a psychological breakdown after Andrea's father was murdered. Emilia became incapable of caring for Andrea, and Emilia's sister, Ann, agreed to take Andrea into her home. Emilia visited her daughter on weekends. By 2001, Ann's relationship with her niece turned sour, and an allegation that Andrea had been abused triggered involvement by the Division of Youth and Family Services (Division).

After placing Andrea with Ann, Emilia struggled with her addiction to heroin and from the cascading problems related to her addiction, including homelessness and unemployment. In 2000, Emilia was convicted of possession of drugs, which resulted in her serving a six-month prison term and a three-year probationary period. Despite her sorry plight, Emilia managed to maintain a relationship with Andrea, periodically visiting her while she remained at Ann's home. After Andrea was transferred from Ann's

---

[1] We have used pseudonyms for the names of defendant E.P. (Emilia), her daughter A.H. (Andrea), and defendant's sister (Ann).

[2] The facts recited here were developed at various proceedings in the Chancery Division, Family Part (family court), and in supplemental papers filed with this Court by the parties in January 2008 and April 2008.

home to foster care, Emilia visited her daughter as often as the court permitted, usually once every two weeks.

Emilia has attempted to deal with her drug addiction problem through multiple in-patient and out-patient programs from 1998 to 2007. Throughout those years she repeatedly relapsed, as evidenced by positive drug tests in late 2004 and early 2005. However, as of January 2008, Emilia was in an out-patient drug treatment program called Khaleidoscope and had not used illicit drugs in the prior year. In 2003, Emilia's nomadic existence came to an end when she found an apartment in Bayonne. That year, she also began a job as a waitress in a diner. In 2001, Emilia successfully completed a parenting skills program, and did so again in 2004 with her long-term boyfriend.

Emilia, for the most part, complied with the Division's reunification plan. She submitted to psychological evaluations and random drug tests, attended psychotherapy sessions and drug rehabilitation programs, which included the taking of methadone to treat her heroin addiction. She also maintained steady contact with Andrea. Nonetheless, because of Emilia's intractable drug problem, in April 2004, the Division filed a Guardianship Complaint seeking the termination of her parental rights. In December 2004, Emilia signed an identified surrender that would have effected a legally binding transfer of all her parental rights to Andrea's then-caretaker.[3] Emilia had concluded that she was "unable to reduce her methadone level to the point where she [c]ould care for and parent [Andrea]." However, that caretaker ultimately decided that she did not want to adopt Andrea.

---

[3] "In practice, an 'identified surrender' means that those exact person(s) as to whom the surrender is made shall adopt the children. If for some reason the 'identified' persons are not able to adopt the child, the surrender becomes 'void' and the parental rights of surrendering parent(s) are reinstated." *N.J. Div. of Youth & Family Servs. v. D.M.B.*, 375 *N.J.Super.* 141, 145, 866 A.2d 1048 (App.Div.) (quotation omitted) (citing *N.J.S.A.* 9:3–38(j), 9:3–41, and 30:4C–23), *certif. denied,* 183 *N.J.* 586, 874 A.2d 1105 (2005).

## B.

Now we turn to Andrea's story. Since her mother's breakdown ten years ago, almost thirteen-year-old Andrea has been placed in twelve different foster homes. The first placement with her aunt Ann lasted approximately four years. Andrea's relationship with her aunt can best be described as tumultuous, with Andrea acting out—engaging in tantrums and defiant behavior—and Ann physically abusing Andrea, which led to the Division's intervention. Attempting to maintain the family unit, the Division offered counseling, parenting skills, and homemaker services. Despite the Division's frequent contact with Ann and Andrea between December 2001 and March 2003, the problems between the two persisted. Eventually, Ann concluded that she could not handle Andrea's behavioral issues, and Andrea requested that she be returned to her mother.

With Ann's consent, Andrea was removed and sent to live in a foster home. That placement lasted less than two months.[4] What followed was a succession of placements in foster homes, a shelter, and a treatment facility. During this rootless period in Andrea's life, Emilia continued to visit with her daughter, who developed a positive relationship with Emilia's boyfriend.

As she moved from one home to another, Andrea asked to be reunited with her mother. Andrea's behavioral problems continued, including tantrums, explosive outbursts, assaults on other children and school staff, and physical threats directed at various foster parents. On several occasions she either threatened or tried to kill herself. For example, in March 2004, she was prevented from jumping out the window of a shelter. Following that incident, Andrea was transferred to an "emergency" foster home in Newark and later to a treatment home because of her

---

[4] At about that time, the Division filed an Abuse–Neglect Complaint against Emilia. A family court judge found that Emilia was drug addicted and could not be given custody of Andrea, and therefore placed Andrea "in the immediate custody, care, and supervision of the Division."

emotional instability. Two months later, she was shuttled back to the Newark foster home, where she remained from June 2004 until January 2006.

The Division planned for Andrea, then age nine, to be adopted by that foster family, which appeared to provide a stable environment. However, in addition to Andrea, the foster parents were also caring for another foster child and several mentally ill adults, who acted inappropriately in Andrea's presence. In December 2004, days after Emilia signed the identified surrender to the Newark foster family, Andrea told her teacher that "if she could not be with [Emilia] she wanted to die." Soon afterwards, Andrea stuffed a sock in her mouth and tried to swallow it in a failed effort to kill herself. About one month later, Andrea's crude effort to hang herself from a door at school was stopped by a staff member, and she was taken to a hospital for a psychiatric evaluation.

The Division learned in April 2005 that the foster parents were no longer interested in adopting Andrea, and three months later the Division moved before the family court to vacate the identified surrender and filed a second Guardianship Complaint seeking to terminate Emilia's parental rights. In January 2006, Andrea was placed in her seventh foster home.

C.

The guardianship hearings took place over six days between July 2005 and February 2006. On the second hearing day in September 2005, Emilia did not dispute that she had recently relapsed to heroin usage. Despite her stumble, she advised the court that she was committed to her recovery program and prepared to go in-patient for treatment, to reduce her methadone levels, and to continue counseling with the ultimate goal of regaining custody of her daughter. On the following hearing day, the family court encouraged the Division to "reconsider ... kinship guardian[ship] based upon the child's age and her attachment to her mother." That alternative, however, according to the Divi-

sion, did not appear feasible because Andrea's then-foster family had no interest in caring for her until she reached the age of eighteen. The court suggested that mediation might make the kinship guardian option a viable alternative, allowing Emilia enough time to get her life together to regain custody of her daughter. The court noted that Andrea, who was ten years old and soon to be eleven, had no desire to be adopted and therefore an attempt at adoption would likely be "futile."

During the two last days of hearings in February 2006, the family court heard testimony from a number of witnesses bearing on the question of whether Emilia's parental rights should be terminated. Emilia called as her expert witness Dr. Antonio Burr, a psychologist, who offered his opinion that Emilia's "reunification with [Andrea] would be in the best interest of the child." Dr. Burr conducted a bonding evaluation and concluded that Andrea had a "very strong attachment" to her mother, whom she saw as "the person capable of providing for her physical and emotional needs." Dr. Burr reported that Andrea "wanted to return home," "had no other competing parental figures in her life," and did "not want to be adopted."

Because of Andrea's preadolescent age and her immediate need for parental nurturing and social guidance, Dr. Burr observed that there remained a "narrow window of opportunity" for success in either a reunification or adoption. Dr. Burr maintained that if Andrea rejected adoption and was stripped of her relationship with her mother, while still yearning for her, Andrea would likely manifest more serious behavioral problems. He believed that it would be better to have a "failed reunification than no reunification" because then, at least, if her mother proved incapable of parenting her, Andrea would "be able to move [on] emotionally" and either look to other people to fulfill her unmet needs or become self-sufficient. Dr. Burr, who also conducted a psychological evaluation of Emilia, maintained that if Emilia continued with counseling, remained drug-free and committed to rehabilitation, with support, "she [was] capable of parenting [Andrea]." Dr.

Burr, however, premised his opinion on his mistaken belief that Emilia had not relapsed within the past six months.

The Division's expert psychologist, Dr. Frank Dyer, also conducted a psychological evaluation of Emilia and a bonding evaluation. Although he found that Emilia was "the only consistent figure in [Andrea's] life to whom she has a positive emotional connection," he also concluded that Emilia did "not possess adequate parenting capacity to be able to care for" her daughter. To emphasize that Emilia had not sufficiently progressed in her drug recovery, he noted that Emilia had relapsed in September 2004 and the summer of 2005. Unlike Dr. Burr, he believed that a "failed reunification" with her mother was not in Andrea's best interests and that Andrea still had the ability to become attached to another caretaker. In his view, it was especially important for Andrea to have a permanent caretaker because Andrea needs "a great deal of structure, supervision, therapeutic attention, and continuation of her medication monitoring by a psychiatrist, and also special education geared towards her emotional and behavioral problems."

Kim Pyron, a Division adoption specialist, stated that older foster children are more difficult to place and that before parental rights are terminated, the Division is limited to searching for adoptive families in New Jersey. She indicated that if Emilia's parental rights were terminated, the Division would then attempt a nationwide search for an adoptive home. At the time of Ms. Pyron's testimony, the Division did not have any particular home in mind for adoption. She recounted from her experience that it could take two to three years to find a placement for an older child through "select home adoption"—a process that includes looking for an adoptive home in New Jersey and registering the child on the national adoption exchange.

Andrea's law guardian called Orly Kennan, a social worker associated with Kid Connection, an agency that works with children and families. Since January 2004, Ms. Kennan had met with Andrea once a week and with Emilia, in all, eighteen times.

According to Ms. Kennan, Andrea did not react well to previous attempts to sever her relationship with her mother and, indeed, had attempted on several occasions to kill herself. Ms. Kennan further stated that an adoption by Andrea's then-foster mother—an adoption that Andrea said she approved—was "not an option right now." When she talked to Andrea about the potential termination of her mother's parental rights and adoption, Andrea became "withdraw[n]" and "sobbed for quite awhile."

Emilia testified about her gainful employment as a waitress, about living in the same apartment in Bayonne for three years, and about her ongoing five-year relationship with a man who gave her emotional and financial support, and whom her daughter called "daddy." At the time of the hearing in February 2006, Emilia was taking medication for anxiety and depression and attending a program at the Mount Carmel Guild, where she was learning parenting skills and receiving treatment for substance abuse, which included participation in Narcotics Anonymous and Alcoholics Anonymous.[5] Emilia indicated that she desperately wanted to be reunited with her daughter and was prepared to make the necessary arrangements to do so, such as leasing a larger apartment, rearranging her work schedule, and dealing with Andrea's considerable emotional problems. She also indicated that her brother, who had an apartment in the same building where she lived, and sister, who resided in Texas, would provide assistance to her. She further proposed that either her brother or her sister Ann in New Jersey could be designated as a kinship legal guardian.

The family court—despite the opposition of Andrea's law guardian—terminated Emilia's parental rights based on the four-factor

---

[5] In her February 2006 testimony, Emilia stated that she had not relapsed in the summer of 2005, but rather in December 2004. She further indicated that she had no positive urine tests since 2004. Those statements contradicted the then-undisputed representations made by her attorney at the September 2005 hearing that she had relapsed in the summer of 2005.

best-interests-of-the-child test set forth in *N.J.S.A.* 30:4C–15.1(a).[6] First, the court found that Andrea's health and development were endangered by Emilia's continued drug use, deep depression, and inability to provide a home for her child. The failure "to provide stability for herself and her child" not only contributed to Andrea's current emotional problems, but also led to Andrea's placement in various foster homes, where in "some" she was subjected to abuse.

Second, the court was convinced that Emilia had not taken sufficient steps to ensure that Andrea would no longer be at risk. Although Emilia had "shown some degree of improvement and stability in her lifestyle, employment history," and had a well established personal relationship, the court found that Emilia was not ready to parent or "provide a safe and stable home for the child." While emphasizing the child's "paramount need for a permanent and defined parent-child relationship," the court conceded that the Division's plan for selective home adoption "very often results in a child becoming a legal orphan until the age of 18" and, even if it works, "take[s] a very long time to effectuate."

Third, the court was satisfied that the Division "made diligent" efforts to assist Emilia with the goal of reuniting mother and child. The court found that Emilia had not availed herself of the Division's rehabilitative services and failed to take command of her drug problem, as evidenced by her multiple relapses, specifically those in December 2004 and the summer of 2005. In short, the rehabilitation offered was unable to break Emilia of her long-term drug dependency, which amplified other stressors in her life. The court also rejected kinship guardianship as a viable option because one of Emilia's proposed caretakers, her sister Ann, already had proven incapable of parenting Andrea, and the other, her brother, did not appear at trial to show an interest in taking custody of Andrea.

---

[6] The law guardian conceded that the Division had proven the first three factors, and Emilia conceded that the first factor had been proven.

The court expressed some ambivalence about the final factor in the best-interests-of-the-child test, whether "[t]ermination of parental rights will not do more harm than good." *N.J.S.A.* 30:4C–15.1(a)(4). The court acknowledged that "[Andrea] is strongly attached to [Emilia]," even though their relationship had been circumscribed to two-hour visits every other week for three years. Because Emilia has been the "only consistent figure in [Andrea's] life," the court also recognized that the severing of Andrea's ties to her mother would be "extremely painful" and perhaps "even devastating." According to the court, one might conclude "that termination would not be appropriate due to [Emilia's] rehabilitation, remission of drug usage, the overwhelming strong attachment of the child to Emilia . . ., there being no preadoptive home, no other attachment figure in the [child's] life." Those considerations, however, in the court's mind, were outweighed by Emilia's lack of "honesty" about her continued drug dependency, and on that basis it "reject[ed] her credibility almost entirely."

While noting that it was "highly questionable" that Andrea would ever successfully be placed in an adoptive home, the court nonetheless terminated Emilia's parental rights in order to give Andrea "at least an opportunity for permanency." The court realized, however, that even if a home were ready to adopt Andrea, she might say, "I don't want to be adopted," and that her preference would have to be given some weight. Additionally, if adoption was not effectuated and Emilia "stabilize[d] her life," the court suggested that there was support for "the proposition" that Emilia could "com[e] back to court to reopen this case at sometime in the future."

The court ordered a three-month minimum transition period during which Emilia would be allowed to visit Andrea.

### D.

In an unpublished opinion, 2006 WL 2986612, the Appellate Division affirmed the termination of Emilia's parental rights, "substantially for the reasons stated by [the family court]." The

panel deferred to the "insights and expertise" of the family court, which balanced the "potential harm to this child from termination as weighed against the abiding and consistent harm from continuing the status quo." The panel underscored the difficult choices presented in this case by noting that "there can be no certainties regarding the future; only a balancing of probabilities."

We granted Emilia's petition for certification. 190 *N.J.* 257, 919 *A.*2d 850, 851 (2007). We also granted the motion of Legal Services of New Jersey (Legal Services) to participate as amicus curiae.

## II.

### A.

The right of a parent to raise a child and maintain a relationship with that child, without undue interference by the state, is protected by the United States and New Jersey Constitutions. *See Stanley v. Illinois,* 405 *U.S.* 645, 651–52, 92 *S.Ct.* 1208, 1212, 31 *L.Ed.*2d 551, 558–59 (1972); *In re Guardianship of K.H.O.,* 161 *N.J.* 337, 346, 736 *A.*2d 1246 (1999). That fundamental parental right, however, is not without limitation. The State has a basic responsibility, as *parens patriae,* to protect children from serious physical and psychological harm, even from their parents. *K.H.O., supra,* 161 *N.J.* at 347, 736 *A.*2d 1246. When the safety and welfare of a child become so irredeemably jeopardized by parental abuse or neglect, the State may take the most extreme form of action, which is to completely sever the relationship between a mother or father and a child. *N.J. Div. of Youth & Family Servs. v. A.W.,* 103 *N.J.* 591, 604–11, 512 *A.*2d 438 (1986).

Because of the elemental nature of the parent-child relationship, and recognizing that the severing of that relationship is among the most "severe and ... irreversible" forms of state action, *Santosky v. Kramer,* 455 *U.S.* 745, 759, 102 *S.Ct.* 1388, 1398, 71 *L.Ed.*2d 599, 610 (1982), we have held that "all doubts

must be resolved against termination of parental rights," *K.H.O.,
supra,* 161 *N.J.* at 347, 736 *A.*2d 1246; *see also In re Adoption of a
Child by D.M.H.,* 135 *N.J.* 473, 481, 641 *A.*2d 235 (stating that
"strict standards must be satisfied before a parent's rights will be
terminated"), *cert. denied,* 513 *U.S.* 967, 115 *S.Ct.* 433, 130 *L.Ed.*2d
345 (1994). In balancing parental rights against the State's inter-
est in the welfare of children, we place a heavy burden on the
State to show that termination of parental rights is in the best
interests of the child. *A.W., supra,* 103 *N.J.* at 604–12, 512 *A.*2d
438 (holding that burden is on Division to prove by clear and
convincing evidence grounds for termination of parental rights).
Under the best-interests-of-the-child standard, a parent's right to
a relationship with a child may be terminated when the State
proves by clear and convincing evidence each of four factors:

(1) The child's safety, health or development has been or will continue to be
endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is
unable or unwilling to provide a safe and stable home for the child and the delay of
permanent placement will add to the harm. Such harm may include evidence that
separating the child from his resource family parents would cause serious and
enduring emotional or psychological harm to the child;

(3) The division has made reasonable efforts to provide services to help the parent
correct the circumstances which led to the child's placement outside the home and
the court has considered alternatives to termination of parental rights;

(4) Termination of parental rights will not do more harm than good.

[*N.J.S.A.* 30:4C–15.1(a).]

[5] Those four factors are not "discrete," but rather "relate to
and overlap with one another to provide a comprehensive standard
that identifies a child's best interests." *K.H.O., supra,* 161 *N.J.* at
348, 736 *A.*2d 1246. The trial court found in this case that the
Division established all four factors, warranting the termination of
Emilia's parental rights.

## B.

None of the parties in this case disputes that the Division
proved prong one, that Andrea's "safety, health or development
has been or will continue to be endangered by the parental

relationship." *N.J.S.A.* 30:4C–15.1(a)(1). However, Emilia claims that the Division did fall short of proving the three remaining factors, and Andrea's law guardian contests the finding on the fourth factor, arguing that termination of parental rights will do more harm than good and therefore is not in Andrea's best interests.

We will not disturb the family court's decision to terminate parental rights when there is substantial credible evidence in the record to support the court's findings.[7] *In re Guardianship of J.N.H.,* 172 *N.J.* 440, 472, 799 *A.*2d 518 (2002). We ordinarily defer to the factual findings of the trial court because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a "feel of the case" that can never be realized by a review of the cold record. *N.J. Div. of Youth & Family Servs. v. M.M.,* 189 *N.J.* 261, 293, 914 *A.*2d 1265 (2007) (internal quotation marks omitted). Only when the trial court's conclusions are so "clearly mistaken" or "wide of the mark" should an appellate court intervene and make its own findings to ensure that there is not a denial of justice. *N.J. Div. of Youth & Family Servs. v. G.L.,* 191 *N.J.* 596, 605, 926 *A.*2d 320 (2007); *see also Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.,* 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974). We are satisfied that the family court correctly concluded that the Division established by clear and convincing evidence factors one through three of the best-interests-of-the-child test.

We first address prongs one and two of that test. Emilia's intractable drug addiction and severe depression rendered her incapable of caring for Andrea and resulted in Emilia voluntarily surrendering physical custody of her daughter to her sister. At the nadir of her downward spiral, Emilia was reduced to a state of homelessness, living at times in cardboard boxes. While Emilia battled depression and drug addiction, Andrea, an emotionally

---

[7] In reviewing the family court's ruling, we limit ourselves only to the facts before that court at the time it made its decision.

fragile child, was cycled through a succession of foster homes, in some of which she was abused. Andrea despaired, longing to be returned to her mother, and threatened to commit suicide on more than one occasion. Although Emilia eventually acquired a solid job and an apartment, and established a long-term responsible relationship, she suffered drug relapses shortly before and during the guardianship hearings. Accordingly, there was sufficient support for the family court's determination that Emilia not only endangered Andrea's "health [and] development," but also was "unable to eliminate the harm facing the child," and thus "unable or unwilling to provide a safe and stable home." *N.J.S.A.* 30:4C–15.1(a)(1) and (2); *see K.H.O., supra,* 161 *N.J.* at 353–54, 736 *A.*2d 1246.

We are also satisfied that, under the third prong of the best-interests test, the record supports the conclusion that the Division made "diligent efforts to reunite the family," *K.H.O., supra,* 161 *N.J.* at 354, 736 *A.*2d 1246, and "considered alternatives to termination of parental rights," *N.J.S.A.* 30:4C–15.1(a)(3). Indeed, Emilia does not contest that the Division offered both her and Andrea a variety of rehabilitative services intended to reunite them as a family unit. Instead, Emilia focuses on what she claims was the Division's failure to consider alternatives to the termination of her parental rights, particularly the possibility of kinship legal guardianship. Although a court may appoint a kinship legal guardian when adoption of the child is neither "feasible [n]or likely," thus preserving the parent-child relationship, *see N.J. Div. of Youth & Family Servs. v. P.P.,* 180 *N.J.* 494, 510, 852 *A.*2d 1093 (2004), in this case, at the end of the family court hearings, there was no person available to serve as a kinship legal guardian. *See N.J.S.A.* 3B:12A–1 to –7 (explaining terms of kinship legal guardianship). Andrea had been moved during the hearings to a new foster home, and there was no suitable relative or adult with whom she had bonded willing to undertake the responsibility. Therefore, the trial court did not err in finding that the Division had met its burden on the third prong.

## C.

Ultimately, prong four presented the only close issue for the family court, which struggled to determine whether the termination of Emilia's parental rights would not do more harm to Andrea than good. *See N.J.S.A.* 30:4C–15.1(a)(4). It is this issue on which the case turns.

Emilia asserts that termination of her parental rights will do more harm than good, leaving Andrea with the status of "a legal orphan, traumatically [separated] from her mother, without any stable, nurturing permanent family." In light of Andrea's age, her strong, persistent attachment to her mother, and current behavioral problems, the Division, according to Emilia, failed to show that Andrea could "form a bond with *any* adoptive parent or that the emotional damage the child would suffer by being permanently cut off from her mother would not be so severe that no adoptive home could compensate for it." Thus, Emilia contends that the psychological damage Andrea would suffer from the complete severance of the mother-child relationship was not outweighed by the unrealistic hope of the permanent placement of Andrea in an adoptive home.

Andrea's law guardian largely agrees with Emilia, finding that the severance of Andrea's relationship with her mother without the prospect of a permanent placement in the near future failed to further the public policy of securing "permanency" for Andrea. The law guardian believes that the family court erred by focusing more on Emilia's serious parental shortcomings than on the significant harm that would be caused to Andrea by a termination of parental rights. In the law guardian's opinion, the court's determination should not have turned on whether Emilia was honest about whether she suffered a relapse, but whether it was in Andrea's best interests to have no further relationship with her mother.

Amicus Legal Services also perceives no benefit to Andrea from the termination of her mother's parental rights, given that "there is no other bonded relationship, no specific prospective adoptive

home and no significant likelihood of such a placement." In the view of amicus, the "Appellate Division decision elevates a remote prospect of finding an adoptive home in the future to a higher status than the harm to the child from destroying a strong parent-child bond." Additionally, amicus Legal Services asserts that, given Andrea's age, her preferences should have been given weight by the family court. Amicus recommends that this Court require, in appropriate circumstances, that the wishes of a mature child be given consideration before a child's relationship with a biological parent is torn apart and the child freed for adoption.

In contrast, the Division maintains that reversing the family court's termination of Emilia's parental rights would deny Andrea the opportunity of ever having a permanent family relationship in an adoptive or any home. The Division claims that keeping Andrea in foster care for the next five years would be against the public policy of this state. The Division points out that the law "sets time frames for achieving permanency for children" and that, by the time of the hearings, Andrea had not lived with her mother for seven years nor had any stability or permanency in her life. The Division notes that it has a responsibility under *N.J.S.A.* 30:4C–15 to file a petition for termination of parental rights "no later than when the child has been in placement for 15 of the most recent 22 months." That statute then requires the Division to make efforts to identify and approve "a qualified family to adopt the child." *Ibid.*

The Division also emphasized that Andrea has a "window of opportunity, albeit small, to attach to someone else." While acknowledging the potential harm inherent in terminating the relationship between a child and her biological parent, the Division argues that Andrea will suffer greater harm if she is not placed in a permanent home. The Division asserts that once Andrea is freed for adoption, it will be able to place her either in an adoptive home in New Jersey or in a home in some other state through the national registry.

## III.

 With those arguments in mind, we now address wheth-er the Division proved by clear and convincing evidence that "termination of parental rights will not do more harm than good to the child." *K.H.O., supra,* 161 *N.J.* at 354–55, 736 *A.*2d 1246; *accord N.J.S.A.* 30:4C–15.1(a)(4). Prong four "serves as a fail-safe against termination even where the remaining standards have been met." *N.J. Div. of Youth & Family Servs. v. G.L.,* 191 *N.J.* 596, 609, 926 *A.*2d 320 (2007). The question ultimately is not whether a biological mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with that parent. It has been "suggested that [a] decision to terminate parental rights should not simply extinguish an unsuccessful parent-child relationship without making provision for . . . a more promising relationship . . . [in] the child's future." *A.W., supra,* 103 *N.J.* at 610, 512 *A.*2d 438 (alterations in original) (quotation omitted). It also is widely understood that a "child deeply needs association with a nurturing adult" and that "permanence in itself is an important part of that nurture." *Ibid.*

When a parent has exposed a child to continuing harm through abuse or neglect and has been unable to remediate the danger to the child, and when the child has bonded with foster parents who have provided a nurturing and safe home, in those circumstances termination of parental rights likely will not do more harm than good. *See, e.g., K.H.O., supra,* 161 *N.J.* at 360–61, 736 *A.*2d 1246; *In re Guardianship of J.C.,* 129 *N.J.* 1, 18, 608 *A.*2d 1312 (1992). The "good" done to a child in such cases in which reunification is improbable is permanent placement with a loving family, which after all is the principal goal of our foster care system. But even in those situations, we have cautioned that the Division must show "that separating the child from his or her foster parents would cause serious and enduring emotional or psychological harm." *J.C., supra,* 129 *N.J.* at 19, 608 *A.*2d 1312.

On the other hand, courts have recognized that terminating parental rights without any compensating benefit, such as adoption, may do great harm to a child. *A.W., supra*, 103 *N.J.* at 610–11, 512 *A.*2d 438. Such harm may occur when a child is cycled through multiple foster homes after a parent's rights are severed. *Id.* at 611, 512 *A.*2d 438. " 'Indeed, the detriment may be greater than keeping the parent-child relationship intact since the child's psychological and emotional bond to the parent may have been broken with nothing substituted in its place.' " *Ibid.* (quoting *In re Angelia P.*, 28 *Cal.*3d 908, 171 *Cal.Rptr.* 637, 623 *P.*2d 198, 210 (1981) (Bird, C.J., concurring and dissenting)). We know that "[t]ermination of parental rights does not always result in permanent placement of the child" and "that too many children 'freed up' for adoption do not in the end find permanent homes." *J.C., supra*, 129 *N.J.* at 21, 608 *A.*2d 1312.

We are not facing here, as in so many cases, dueling expert opinions about whether a child is more strongly bonded to his biological parents than to his foster parents. *See id.* at 22–23, 608 *A.*2d 1312 (discussing use of experts in termination cases). Rather, we confront the case of an almost thirteen-year-old, psychologically fragile girl, who has bounced around from one foster home to another, and whose only enduring emotional bond is with her mother. At the time of the guardianship hearings, Andrea had moved to her seventh foster home, and there was no permanent placement for Andrea in sight. The slim hope of adoption then appears just as elusive today. Against the bleak prospect of adoption remains the one sustaining force in Andrea's young life— her mother's love and emotional support.

The termination of Emilia's parental rights does not appear to have any real compensating benefit, particularly in light of the expert opinions rendered at the guardianship hearings that the "window of attachment to somebody else is closing real fast." That "window" is considerably narrower today than it was two years ago.

In weighing the evidence on prong four, the family court candidly assessed the balance between the slender prospect of adoption against Andrea's certain and intense bond to her mother. The court recognized that Emilia, despite her multiple drug relapses, was the "only consistent figure in [Andrea's] life" and that completely severing the mother-daughter ties would be "extremely painful" and even "devastating" to Andrea. The court accepted that it was "highly questionable" that Andrea would ever find a permanent home with a foster family. Nevertheless, the court decided in favor of terminating Emilia's parental rights in order to give Andrea "at least an opportunity for permanency," while holding out the potential for Emilia to reopen the case in the future if she "stabilize[d] her life" and an adoption did not materialize. The court, it appears, terminated Emilia's parental rights with a marked reluctance, understanding that its conclusion that termination would not do more harm than good was a prediction, at best. Our review of the record indicates that the family court acted conscientiously with an eye always towards Andrea's best interests.

We cannot conclude, however, that there is sufficient support in the record for the conclusion that the Division proved by clear and convincing evidence that termination would not do more harm than good to Andrea. Although this Court, the State Legislature, and even the United States Congress,[8] have emphasized that

---

[8] In 1997, Congress passed the Adoption and Safe Families Act of 1997, *Pub.L. No.* 105–89, 111 *Stat.* 2115, which promised federal funding for "foster care ... and adoption assistance" as long as states comply with certain requirements, including certain permanency goals. 42 *U.S.C.A.* § 670. The federal legislation requires that the "State shall file a petition to terminate the parental rights of the child's parents ... and, concurrently, to identify, recruit, process, and approve a qualified family for an adoption" when a child has been in foster care for the last fifteen out of twenty-two months. 42 *U.S.C.A.* § 675(5)(E). This requirement has been incorporated into New Jersey law. *See N.J.S.A.* 30:4C–15. However, both the federal and state statutes have an exception in cases where the State can document "a compelling reason for determining that filing such a petition would not be in the best interests of the child." 42 *U.S.C.A.* § 675(5)(E)(ii); *accord N.J.S.A.* 30:4C–15.3(b).

permanency must be the Division's goal, *see N.J.S.A.* 9:3A–2(d); *K.H.O., supra,* 161 *N.J.* at 357–58, 736 *A.*2d 1246, none has stated that the unlikely possibility of permanency in the future should outweigh a strong and supportive relationship with a natural parent. The sad reality is that Andrea has been hopelessly adrift within the foster care system, and the termination of her mother's parental rights removed her one mooring—the one enduring and sustaining emotional relationship that she has in this world.

Based on a failure of proof on prong four, we reverse the Appellate Division, which affirmed the family court's decision to terminate Emilia's parental rights. We hold that the family court was clearly mistaken in finding that the Division satisfied the four-prong best-interests-of-the-child test and in terminating Andrea's relationship with her mother.

## IV.

### A.

Because this case must be remanded to the family court, we now review developments in the lives of Emilia and Andrea since February 2006 that may bear on any new proceedings.[9]

Andrea is now almost thirteen years old and is still in foster care. In the approximately two-and-one-half years since Emilia's rights were terminated, Andrea has been moved five times. In July 2007, she was placed in the home of a school friend, but was removed from that home eight months later at the foster parents' request because of her behavioral problems.

In the meantime, Emilia enrolled in a new substance abuse program and did not suffer a drug relapse between January 2007 and January 2008. She has maintained her residence in Bayonne

---

[9] The Division and Emilia filed motions to supplement the record prior to oral argument before this Court. We granted those motions in January 2008. Later, the Division informed us that Andrea was moved to her twelfth placement on March 7, 2008.

and her job as a waitress, and continued to stay involved in Andrea's life, developing relationships with the administrators at Andrea's school. Emilia's visitation was terminated in December 2006, after the Appellate Division rendered its decision, and reinstated in June 2007, after this Court granted certification. Emilia's current counselor from Khaleidoscope recommended to this Court, in July 2007, that Emilia should "be allowed to obtain custody of her daughter." The counselor averred that Emilia "is of stable mind, abstaining from usage of illicit substances, and has family support and a stable residence in Bayonne, New Jersey with a room for her daughter."

This Court is not the proper forum to resolve questions about Andrea's present guardianship status or her future relationship with her mother. Any changed circumstances concerning the lives of Emilia and Andrea must be brought to the attention of the Division and the family court. Based on the most current evidence before it, the Division then will have to consider the appropriate course of action to take.

### B.

Last, we note that amicus Legal Services urges that family courts should consider, in appropriate cases, the wishes of a "mature" child before deciding whether to terminate a parental relationship with that child. We believe that proposal has merit, and we would not be surprised if, in proper circumstances, family courts already take into consideration the views of a child who is of sufficient age and capable of forming an intelligent opinion. *See* Christina M. McClurg, *Foster Care and Adoption: Effectuation of Minor's Right to State Preference for Foster Placement*, 11 *J. Contemp. Legal Issues* 586, 587–88 (2000) (recommending that courts take into account minor's wishes in termination proceedings, but noting " 'the tremendous diversity that exists among children' " and recommending that " '[t]he process must be sufficiently flexible to provide some accommodation to the varying circumstances that will inevitably present themselves' " (quoting

*In re Leo M.*, 19 *Cal.App.*4th 1583, 24 *Cal.Rptr.*2d 253, 258–59 (1993))). The family court must decide what is in the best interests of the child at a parental-rights termination hearing; a child's wishes should be but one factor.

It bears mentioning that before granting a proposed adoption, the family court must hear from and consider the wishes of a child over the age of ten "if the child is of sufficient capacity to form an intelligent preference regarding the adoption." *N.J.S.A.* 9:3–49. Moreover, the wishes of children over the age of ten have been considered by family courts in other contexts, such as whether a nearly sixteen-year-old should have visitation with her older siblings. *See L. v. G.*, 203 *N.J.Super.* 385, 399, 497 *A.*2d 215 (Ch.Div.1985).

Children involved in parental termination cases are statutorily entitled to an attorney to represent their interests. *See N.J.S.A.* 30:4C–15.4(b) (requiring that "[a] child who is the subject of an application for the termination of parental rights ... shall be represented by a law guardian"). "Law guardians are obliged to make the wishes of their clients known...." *N.J. Div. of Youth & Family Servs. v. Robert M.*, 347 *N.J.Super.* 44, 70, 788 *A.*2d 888 (App.Div.), *certif. denied*, 174 *N.J.* 39, 803 *A.*2d 635 (2002).

We are mindful that children's wishes may often not be in their own best interests. For example, children may want to return to their abusive or neglectful natural parents, who have endangered and continue to endanger their lives. In such cases, it may be not only futile, but contrary to a child's best interests to solicit his or her opinion. Ultimately, the family court is charged with making decisions that will protect the health, safety, and welfare of the children who come before it. We believe that in appropriate cases, the family court would benefit from hearing the wishes of a child over the age of ten, who has reached a level of maturity that allows the child to form and express an intelligent opinion.[10]

---

[10] Children faced with parental termination are mostly under the age of ten. According to the United States Department of Health and Human Services, as of

Moreover, when such a child on his or her own initiative requests the opportunity to express an opinion, the court should allow the child to do so. Because each case will bring to bear particular factors that relate to the psychological well-being of a child, we leave this matter to the sound discretion of the family court.

## V.

In the unique circumstances of this case, a parent-child relationship that continued to provide emotional sustenance to the child should not have been severed based on the unlikely promise of a permanent adoptive home. We conclude that the Division of Youth and Family Services did not prove by clear and convincing evidence that termination of Emilia's parental rights would not do more harm than good. For the reasons expressed, we reverse the judgment of the Appellate Division, vacate the termination of Emilia's parental rights, and remand for further proceedings consistent with this opinion.

Justice RIVERA–SOTO, dissenting.

Although one would be hard-pressed to disagree with the compassionate and lofty principles embraced by the majority, a threshold question remains unaddressed: is this matter worthy of review by this Court? Because I conclude that this case does not satisfy the standards required to justify the grant of a petition for certification, I respectfully dissent.

---

September 2003, of the children in foster care who had been separated from their parents and were waiting adoption, only eleven percent were over the age of ten. The AFCARS Report (Interim FY 2003 Estimates as of June 2006), http://www.acf.hhs.gov/programs/cb/stats_research/afcars/tar/report10.htm. In addition, only nineteen percent of those children adopted out of foster care were over the age of ten. *Ibid.* Also according to the United States Department of Health and Human Services, of children in our state whose status was "finalized"— meaning placed in a permanent situation—between October 2004 and September 2005, only fifteen percent were over the age of ten. Child's Finalized Age (Grouped) (May 2007), http://www.acf.hhs.gov/programs/cb/stats_research/afcars/statistics/final_tbl3_2005.htm.

*Rule* 2:12–4 lays out clearly the very high hurdle a petition for certification must vault in order to justify review by this Court:

> Certification will be granted only if the appeal presents a question of general public importance which has not been but should be settled by the Supreme Court or is similar to a question presented on another appeal to the Supreme Court; if the decision under review is in conflict with any other decision of the same or a higher court or calls for an exercise of the Supreme Court's supervision and in other matters if the interest of justice requires. *Certification will not be allowed* on final judgments of the Appellate Division *except for special reasons.*
>
> [ (Emphasis supplied).]

We have explained the bases for the vacation of an earlier grant of certification in the following terms:

> The judgments below reflect the application of established principles ... to an intensely factual situation, in no way implicating an unsettled question of general public importance. We also are not persuaded that the question requires invocation of our certification authority in "the interest of justice," because the result reached below is not palpably wrong, unfair or unjust. Further, because this case does not present a conflict between the Appellate Division and any other decision of the same or a higher court, it similarly does not call for an exercise of this Court's supervisory powers.
>
> [*Bandel v. Friedrich*, 122 *N.J.* 235, 237–38, 584 *A.*2d 800 (1991) (citations and internal quotation marks omitted).]

*See also Fox v. Woodbridge Township Bd. of Educ.*, 98 *N.J.* 513, 515, 488 *A.*2d 1020 (1985) (O'Hern, J., concurring) (explaining that vacation of grant of certification is proper when case "remains an essentially factual dispute hardly requiring Supreme Court review"); *Mahony v. Danis*, 95 *N.J.* 50, 51, 469 *A.*2d 31 (1983) (Handler, J., concurring) (stating that, "[i]n exercising our discretionary authority to decide which cases should be certified for final adjudication by the Supreme Court, we must be governed by the standards prescribed for the discharge of this responsibility. *R.* 2:12–4. The application of these standards in this case reveals no substantial grounds for certification."); *In re Contract for Route 280, Section 7U Exit Project*, 89 *N.J.* 1, 444 *A.*2d 51 (1982) (order dismissing appeal, stating reasons certification was improvidently granted).

In specific, this appeal presents the tragic and heart-breaking events arising out of the termination of a mother's parental rights. However, no matter how emotionally compelling these events may

be, they present little that is different from the deluge of parental rights termination cases that daily flood our docket. Thus, this case does not present "a question of general public importance[;]" it does not present a "conflict with any other decision of the same or a higher court[;]" it does not present an instance that "calls for an exercise of the Supreme Court's supervision[;]" it does not present a case that should be reviewed because "the interest of justice requires[;]" and it does not present any "special reasons." In light of the foregoing, certification of this appeal should be vacated as improvidently granted.

*For reversal/vacation/remandment*—Chief Justice RABNER and Justices LaVECCHIA, ALBIN, WALLACE and HOENS—5.

*For dissenting*—Justice RIVERA–SOTO—1.