RECORD IMPOUNDED

 NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-3650-15T2

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

 Plaintiff-Respondent,

v.

S.L.,

 Defendant-Appellant.
______________________________

IN THE MATTER OF THE GUARDIANSHIP
OF A.L., a minor.
__________________________________________________

 Submitted April 4, 2017 – Decided May 12, 2017

 Before Judge Messano and Suter.

 On appeal from the Superior Court of New
 Jersey, Chancery Division, Family Part,
 Monmouth County, Docket No. FG-13-82-14.

 Joseph E. Krakora, Public Defender, attorney
 for appellant (Daniel DiLella, Designated
 Counsel, on the brief).

 Christopher S. Porrino, Attorney General,
 attorney for respondent (Melissa H. Raksa,
 Assistant Attorney General, of counsel; Megan
 E. Shafranski, Deputy Attorney General, on the
 brief).
 Joseph E. Krakora, Public Defender, Law
 Guardian, attorney for minor (Michele C.
 Scenna, Designated Counsel, on the brief).

PER CURIAM

 Defendant S.L. appeals from the Family Part's April 14, 2016

order terminating his parental rights to his daughter, A.L. (Amy). 1

Defendant argues the Division of Child Protection and Permanency

(the Division) failed to prove by clear and convincing evidence

each prong of the statutory best-interests-of-the-child standard

contained in N.J.S.A. 30:4C-15.1(a):

 (1) The child's safety, health, or development
 has been or will continue to be endangered by
 the parental relationship;

 (2) The parent is unwilling or unable to
 eliminate the harm facing the child or is
 unable or unwilling to provide a safe and
 stable home for the child and the delay of
 permanent placement will add to the harm.
 Such harm may include evidence that separating
 the child from his resource family parents
 would cause serious and enduring emotional or
 psychological harm to the child;

 (3) The [D]ivision has made reasonable efforts
 to provide services to help the parent correct
 the circumstances which led to the child's
 placement outside the home and the court has
 considered alternatives to termination of
 parental rights; and

 (4) Termination of parental rights will not
 do more harm than good.

1 We use initials and pseudonyms of those involved to maintain
confidentiality.

 2 A-3650-15T2
 [Ibid.; see also In re Guardianship of K.H.O.,
 161 N.J. 337, 347-48 (1999).]

The Division and Amy's Law Guardian counter by arguing the judge

correctly concluded the Division had met the requisite burden of

proof, and both urge us to affirm the termination order. We have

considered the arguments raised in light of the record and

applicable legal standards. We affirm.

 I.

 Amy was born prematurely in July 2012. Upon birth, Amy and

her nineteen-year-old mother, J.N. (Janet), tested positive for

marijuana, and Amy remained hospitalized in the Neo-Natal

Intensive Care Unit (NICU) for the next four months. Janet

admitted smoking marijuana throughout her pregnancy and did not

receive pre-natal medical care. The Division investigated and

substantiated a finding of neglect against Janet.2

 The Division had been involved with defendant and Janet since

2010, when their eleven-week-old son was taken to the hospital

with a fractured femur and parenchymal hemorrhage of the brain.

Defendant dropped Janet and the child off at the hospital but

never went inside because he had outstanding warrants for his

arrest. The child was returned to Janet's care in February 2011,

2 Janet executed a voluntary surrender of her parental rights
during the course of this litigation.

 3 A-3650-15T2
but, in July, he accidentally choked to death on candy while left

alone in his crib. In the interim, in January 2011, Janet and

defendant had a second child, a girl, who was born prematurely and

perished the same day.3

 In September 2012, the Division filed a verified complaint

seeking care, custody and supervision of Amy. At the time,

defendant, who was forty-one-years old, was incarcerated at the

Monmouth County Correctional Institute (MCCI), where he remained

until January 2013. The Division placed Amy in a resource home

upon her discharge from the NICU in October 2012. She has remained

there ever since, and Amy's resource family wishes to adopt her.

 Defendant provided contact information to the Division upon

his release from the MCCI. However, he did not seek visitation

with Amy. The Division's efforts to contact defendant met with

little success thereafter, and, in May, when defendant called the

Division to report Janet's excessive drinking, he told the

caseworker he was facing additional criminal charges and possible

incarceration.

 In August 2013, defendant was arrested for failing to appear

in court and remanded to the MCCI. In January 2014, defendant

told the Division that N.B. (Nancy), the mother of two of

3 In total, defendant fathered six children with four different
women.

 4 A-3650-15T2
defendant's other children, was seeking custody of Amy at

defendant's request. The judge denied Nancy's application but

ordered the Division to evaluate her for placement purposes.

Although Nancy was licensed by the Division in July, the Division

did not support her visitation with Amy because she was not a

relative. Nancy did not seek the court's intervention, and neither

of Nancy's two children, Amy's half-siblings, who were adults at

the time, ever contacted the Division.

 In April 2014, the judge entered an order permitting defendant

to have visitation with Amy at the MCCI one day per week. However,

defendant was transferred shortly thereafter to Northern State

Prison, and Amy's first visit with defendant took place there in

October. The Division attempted to continue visitation at the

prison, but there were frequent roadblocks, including defendant's

placement in administrative segregation. In total, Amy had

approximately five visits with defendant, many of which were non-

contact visits where defendant and Amy interacted from different

sides of a glass partition. The child's obvious distress caused

by traveling to and entering the prison shortened a December 2015

visit at defendant's request.

 In the interim, defendant had pled guilty to two indictments

and was sentenced to eight years' imprisonment with a four-year

period of parole ineligibility. Defendant was incarcerated when

 5 A-3650-15T2
the guardianship trial began in June 2015, and remained so through

its completion in April 2016. His first parole eligibility date

was February 17, 2017, and his maximum release date was February

19, 2019.4

 At trial, the Division produced eight lay witnesses and Dr.

Alan J. Lee, Psy.D., as an expert. Dr. Lee conducted a

psychological evaluation of defendant and a bonding evaluation of

Amy and her resource parent. The Law Guardian called an expert

witness, Dr. David R. Brandwein, Psy.D., who also conducted a

bonding evaluation of Amy and her resource parent.

 Defendant testified and called Nancy as a witness. Dr. Jesse

Whitehead, Jr., Psy.D., testified as defendant's expert witness.

Dr. Whitehead had performed a psychological evaluation of

defendant.

 In his oral opinion following trial, Judge Terence P. Flynn

reviewed the evidence, including defendant's lengthy criminal

record, his failure to comply with Division services regarding the

other two children he fathered with Janet and his lack of contact

with the Division after Amy was released from the hospital. The

judge cited Nancy's trial testimony, which "provided some insight

into the defendant and his involvement with her children." Judge

4 During the pendency of this appeal, we have not been advised of
any change in defendant's custodial status.

 6 A-3650-15T2
Flynn noted defendant never lived with Nancy, never provided child

support and never contributed to the college costs of his two

adult children. The judge noted that defendant never thought of

Nancy as a permanent placement for Amy, but rather viewed Nancy

as "a temporary caretaker for his children. His ultimate goal was

to personally care for [Amy]."

 The judge recounted the Division's efforts to facilitate

visitation between Amy and defendant. He noted defendant's refusal

to permit the Division to access his prison records in order to

verify defendant's assertion that he had participated in classes

during his incarceration.

 Judge Flynn reviewed the expert testimony. He found Dr.

Lee's testimony to be credible. The judge accepted Dr. Lee's

opinions regarding defendant's personality disorder and

"maladaptive personality and character traits that adversely

affect his overall functioning and . . . negatively affect . . .

his ability to parent." The judge credited Dr. Lee's opinion that

these "character traits were long lasting and unlikely to change."

Dr. Lee opined that defendant "remained at a heightened risk for

criminal recidivism" and could not be considered "an independent

caretaker [for Amy] now or within the foreseeable future."

 The judge noted similarities between Dr. Lee's and Dr.

Whitehead's opinions. While Dr. Whitehead disputed Dr. Lee's

 7 A-3650-15T2
diagnosis, Dr. Whitehead "found . . . talk of reunification would

be premature . . . . [S]uch talk . . . could only occur after the

defendant had been further assessed upon his release from prison."

In sum, Judge Flynn stated Dr. Whitehead's opinion, "at . . . best

. . . [was] that there was some potential for doing well on

[defendant's] part[,]" but there was "no way [to] be certain of

fulfillment over a definite period of time." Judge Flynn further

noted that both Dr. Lee and Dr. Whitehead agreed that a bonding

evaluation between defendant and Amy would be "fruitless," because

"no bond could be expected."

 Judge Flynn credited Dr. Brandwein's opinion that Amy was

"securely attached" to her resource family, and there was "a bond

that could be expected to be strengthened over time." He noted

Dr. Lee's opinion that Amy had a strong bond with her resource

family, was "clearly free of stress" and "needed permanency."

Although she continued to need medical attention, Amy was

"thriving" and ready to be adopted.

 Judge Flynn then considered the four prongs of N.J.S.A. 30:4C-

15.1(a). We discuss his reasoning more fully hereafter. The

judge entered the judgment terminating defendant's parental rights

to Amy, and this appeal ensued.

 8 A-3650-15T2
 II.

 The principles guiding our review are well-known. "The focus

of a termination-of-parental-rights hearing is the best interests

of the child." N.J. Div. of Youth & Family Servs. v. F.M., 211

N.J. 420, 447 (2012). The four standards contained in N.J.S.A.

30:4C-15.1(a) require a fact-sensitive analysis, and "are neither

discrete nor separate. They overlap to provide a composite picture

of what may be necessary to advance the best interests of the

children." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J.

261, 280 (2007) (quoting N.J. Div. of Youth & Family Servs. v.

F.M., 375 N.J. Super. 235, 258 (App. Div. 2005) (emphasis in the

original)).

 "We will not disturb the family court's decision to terminate

parental rights when there is substantial credible evidence in the

record to support the court's findings." N.J. Div. of Youth &

Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (citing In re

Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). We defer to

the factual findings of the trial judge, who had "the opportunity

to make first-hand credibility judgments about the witnesses

. . . [and] has a 'feel of the case' that can never be realized

by a review of the cold record." Ibid. (quoting M.M., supra, 189

N.J. at 293). Moreover, because of "the family courts' special

jurisdiction and expertise in family matters," we accord even

 9 A-3650-15T2
greater deference to the judge's fact finding. N.J. Div. of Youth

& Family Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (citing

Cesare v. Cesare, 154 N.J. 394, 413 (1998)).

 "Only when the trial court's conclusions are so 'clearly

mistaken' or 'wide of the mark' should an appellate court intervene

and make its own findings to ensure that there is not a denial of

justice." E.P., supra, 196 N.J. at 104 (quoting N.J. Div. of

Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007)). "A

trial court's interpretation of the law and the legal consequences

that flow from established facts are not entitled to any special

deference." N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J.

527, 552-53 (2014) (quoting Manalapan Realty, L.P. v. Manalapan

Twp. Comm., 140 N.J. 366, 378 (1995)).

 Defendant argues the Division failed to prove he caused Amy

harm and, instead, relied upon defendant's incarceration as the

sole basis to prove prong one. He contends that Judge Flynn

misapplied case law regarding the importance of a parent's

incarceration on the best interests analysis. We disagree.

 We have recognized that incarceration "necessarily limits a

person's ability to perform the regular and expected parental

functions. It also may serve to frustrate nurturing and the

development of emotional bonds and [may be] a substantial obstacle

to achieving permanency security, and stability in the child's

 10 A-3650-15T2
life." N.J. Div. of Youth & Family Servs. v. S.A., 382 N.J. Super.

525, 534 (App. Div. 2006) (citations omitted) (internal quotation

marks omitted). Incarceration alone, however, "is an insufficient

basis for terminating parental rights." R.G., supra, 217 N.J. at

556. Rather, the Division must present "particularized evidence

of how a parent's incarceration affects each prong of the best-

interests-of-the-child standard." Ibid. In considering

incarceration within this framework, relevant issues are:

 [P]erformance as a parent before
 incarceration, to what extent his children
 were able to rely on him as a parent, and what
 effort, if any, he has made to remain in
 contact with his children since his
 incarceration. The court should also consider
 whether [the parent] will be able to
 communicate and visit with his children; what
 effect such communications and visitation will
 have on the children in terms of fulfilling
 the parental responsibility to provide nurture
 and emotional support, to offer guidance,
 advice, and instruction, and to maintain an
 emotional relationship with his children.
 Further, the court must consider the risk
 posed to his children by [the parent]'s
 criminal disposition; what rehabilitation, if
 any, has been accomplished since [the
 parent]'s incarceration; and the bearing of
 those factors on the parent-child
 relationship. The court should, with the aid
 of expert opinion, determine the need of the
 children for permanency and stability and
 whether continuation of the parent-child
 relationship with [the parent] will undermine
 that need. Further, the court should determine
 the effect that the continuation of the
 parent-child relationship will have on the

 11 A-3650-15T2
 psychological and emotional well-being of the
 children.

 [Id. at 555-56 (quoting In re Adoption of
 Children by L.A.S., 134 N.J. 127, 143-44
 (1993)).]

We conclude Judge Flynn scrupulously followed the Court's

guidance.

 Judge Flynn carefully considered defendant's lack of

involvement with Amy before he was incarcerated. The judge

acknowledged defendant desired visitation with Amy after he was

incarcerated, but only because of the Division's efforts. Judge

Flynn noted that defendant's criminal history was an indicator of

recidivism. Relying on our decision in New Jersey Division of

Youth and Family Services v. T.S., 417 N.J. Super. 228 (App. Div.

2010), certif. denied, 205 N.J. 519 (2011), Judge Flynn concluded

that defendant had effectively abandoned Amy. See id. at 242-43

(noting the defendant's lack of prior relationship with his child

and failure to demonstrate an ability to parent evidenced an

abandonment of parental responsibility).

 Defendant argues the Division failed to prove prong two,

i.e., that he was unable or unwilling to ameliorate the

circumstances that led to Amy's placement. He contends Judge

Flynn erred by relying upon Dr. Lee's opinion that defendant was

unlikely to be a fit parent in the foreseeable future.

 12 A-3650-15T2
 The second prong "relates to parental unfitness," which may

be established by demonstrating that "the parent is 'unwilling or

unable to eliminate the harm'" or "the parent has failed to provide

a 'safe and stable home'" and "a 'delay [of] permanent placement'

will further harm the child." K.H.O., supra, 161 N.J. at 352

(quoting N.J.S.A. 30:4C-15.1(a)(2)); see also F.M., supra, 211

N.J. at 451 ("Prong two may also be satisfied if 'the child will

suffer substantially from a lack of . . . a permanent placement

and from the disruption of [the] bond with foster parents.'"

(alteration in original) (quoting K.H.O., supra, 161 N.J. at 363)).

 Judge Flynn found that on one level, defendant's continued

incarceration made it impossible for him to parent Amy. However,

based upon the expert testimony, he also concluded defendant was

unable or unwilling to change his criminal lifestyle. The judge

noted defendant continued his life of crime after Amy was born,

rejecting Dr. Whitehead's opinion that the earlier accidental

death of defendant's child was a "wake up call." Moreover, Judge

Flynn cited the expert testimony that Amy needed permanency in her

life, not the disruption of the bond already formed with her

putative adoptive family.

 Regarding the third prong, defendant contends the Division

failed to follow through on placement options he provided,

including Amy's placement with Nancy. He argues the most

 13 A-3650-15T2
appropriate placement for Amy was with her half-siblings, and the

Division failed to do what was necessary to foster visitation and

potentially forge a relationship with them.

 The Division must make "reasonable efforts to provide

services to help the parent correct the circumstances which led

to the child’s placement outside the home," and the court must

"consider[] alternatives to termination of parental rights."

N.J.S.A. 30:4C-15.1(a)(3). Services under the third prong

"contemplate[] efforts that focus on reunification." K.H.O.,

supra, 161 N.J. at 354. "Experience tells us that even [the

Division's] best efforts may not be sufficient to salvage a

parental relationship." F.M., supra, 211 N.J. at 452. "Even if

the Division ha[s] been deficient in the services offered to" a

parent, reversal is not necessarily "warranted, because the best

interests of the child controls" the ultimate determination

regarding termination of parental rights. N.J. Div. of Youth &

Family Servs. v. F.H., 389 N.J. Super. 576, 621 (App. Div.),

certif. denied, 192 N.J. 68 (2007).

 Judge Flynn found the Division had exercised reasonable

efforts to reunify defendant and Amy, but defendant failed to

cooperate. He noted the Division was only able to locate defendant

after he was incarcerated, and problems with visitation were not

the result of "any lack of effort by the Division." The judge

 14 A-3650-15T2
noted the litigation was more than eighteen months old before

defendant offered Nancy as a placement alternative, and defendant

always considered Nancy as only an interim caretaker for Amy.

 We have recognized "the difficulty and likely futility of

providing services to a person in custody[.]" F.H., supra, 389

N.J. Super. at 621 (quoting S.A., supra, 382 N.J. Super. at 535-

36). Further, the need to provide services may be "obviat[ed]"

when the parent "ha[s] no relationship with [his child] and could

not offer the child permanency." T.S., supra, 417 N.J. Super. at

242.

 Defendant cites our decision in New Jersey Divison of Youth

and Family Services v. K.L.W., 419 N.J. Super. 568 (App. Div.

2011), for the proposition that the Division was required to place

Amy with Nancy, because, although Nancy was not a relative, Nancy's

two adult children were defendant's children and Amy's half-

siblings. Defendant misconstrues our decision.

 K.L.W. only recognized the Division's statutory obligation

to explore placement options with relatives. Id. at 577-80.

However, there is no presumption in favor of placement with a

relative. Id. at 580.

 In this case, the Division considered Nancy as a placement

option even though Nancy was not Amy's blood relative. Notably,

neither of Nancy's children, who were blood relatives of Amy, came

 15 A-3650-15T2
forth to exercise visitation with the child, much less offer

themselves as placement resources.

 Finally, defendant argues the Division failed to prove prong

four. He cites Dr. Whitehead's opinion that Amy, who is African-

American, would be best served by a placement with her African-

American half-siblings, or, alternatively with an African-American

resource family, and, thirdly, with an economically capable family

of another race, like her resource family. Defendant contends the

judge ignored the "entire program" Dr. Whitehead "laid out" for

defendant to regain custody of Amy. He argues that Amy's placement

with Nancy was a critical component of that plan. Additionally,

defendant contends Dr. Brandwein specifically opined that, given

Amy's young age, severing ties with her putative adoptive family

would not cause enduring harm.

 The statute's fourth prong mandates a determination as to

"whether a child's interest will best be served by completely

terminating the child's relationship with that parent." E.P.,

supra, 196 N.J. at 108. Prong four "serves as a fail-safe against

termination even where the remaining standards have been met."

G.L., supra, 191 N.J. at 609.

 In most circumstances, the court must examine the child's

bond with both biological and foster parents. K.H.O., supra, 161

N.J. at 355. "[W]here it is shown that the bond with foster

 16 A-3650-15T2
parents is strong and, in comparison, the bond with the natural

parent is not as strong," termination may be appropriate. Id. at

363. "[A]fter considering and balancing the two relationships,"

the question becomes will "the child . . . suffer a greater harm

from the termination of ties with her natural parents than from

the permanent disruption of her relationship with her foster

parents[?]" Id. at 355. Answering that question "necessarily

requires expert inquiry specifically directed to the strength of

each relationship." Ibid. (quoting In re Guardianship of J.C.,

129 N.J. 1, 25 (1992)).

 Judge Flynn found that Amy had no relationship with defendant,

had been in a nurturing, safe, and secure home since birth and was

thriving. There was no harm in terminating defendant's parental

rights because there was no bond between Amy and defendant. Judge

Flynn credited Dr. Lee's opinion that Amy would in fact suffer

serious harm if the bond with her foster family was broken.

 In sum, as to each of the four statutory prongs, there was

"substantial credible evidence in the record to support the court's

findings." E.P., supra, 196 N.J. at 104. We find no reason to

reverse the order under review.

 Affirmed.

 17 A-3650-15T2