RECORD IMPOUNDED

 NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R. 1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-4671-14T1

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

 Plaintiff-Respondent,

v.

M.N.B.,

 Defendant-Appellant.

____________________________________

IN THE MATTER OF THE GUARDIANSHIP OF
J.J.B. and J.M.L.,

 Minors.
_____________________________________

 Argued September 19, 2017 – Decided October 25, 2017

 Before Judges Fisher, Fasciale and Moynihan.

 On appeal from Superior Court of New Jersey,
 Chancery Division, Family Part, Essex County,
 Docket No. FG-07-0203-14.

 Adrienne Kalosieh, Designated Counsel, argued
 the cause for appellant (Joseph E. Krakora,
 Public Defender, attorney; Ms. Kalosieh, on
 the briefs).

 Vonnetta C. Dixon, Deputy Attorney General,
 argued the cause for respondent (Christopher
 S. Porrino, Attorney General, attorney;
 Andrea M. Silkowitz, Assistant Attorney
 General, of counsel; Ms. Dixon, on the brief).

 Olivia Belfatto Crisp, Assistant Deputy Public
 Defender, argued the cause for minors (Joseph
 E. Krakora, Public Defender, Law Guardian,
 attorney; Ms. Crisp, on the brief).

PER CURIAM

 Mae is the mother of two boys, Jack and Jason, born on January

10, 2001 and August 29, 2005, respectively.1 The New Jersey

Division of Child Protection and Permanency filed a guardianship

complaint against Mae seeking to terminate her parental rights to

Jack and Jason. On June 2, 2015, the trial judge heard testimony

from two witnesses called by the Division, interviewed Jason in

camera, and following an oral decision, entered a permanency order

terminating Mae's parental rights to both boys.2

 Mae appealed and while the appeal was pending, we granted the

law guardian's application to resume visitation between Mae and

her sons. We denied the law guardian's subsequent motion to remand

the case to the trial court for a hearing on the best interests

1
 The pseudonyms used for the boys in defendant's brief, and "Mae,"
a name we gave to the defendant, are utilized here to protect
their privacy.
2
 The order also terminated the parental rights of the boys'
natural fathers. Jack's father executed a voluntary general
surrender of his rights on June 2, 2015; after Jason's father
could not be located, the court entered a default against him on
May 14, 2014, and relieved the Division of having to serve him.

 2 A-4671-14T1
of the children, but issued a temporary remand to allow the law

guardian to file a motion for relief from the trial court's

judgment. R. 4:50-1. The motion was filed and, after hearing

testimony from the Division caseworker and arguments of counsel,

the trial judge denied the motion on April 26, 2016, ending the

temporary remand.

 Mae, and the boys through the law guardian, contend that the

trial court erred in terminating parental rights, and in denying

the motion for relief from judgment. We disagree and affirm both

the order terminating parental rights and the order denying the

law guardian's motion for relief.

 "Our review of a trial judge's decision to terminate parental

rights is limited." N.J. Div. of Youth & Family Servs. v. G.L.,

191 N.J. 596, 605 (2007) (citing In re Guardianship of J.N.H., 172

N.J. 440, 472 (2002)). "The general rule is that findings by the

trial court are binding on appeal when supported by adequate,

substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394,

411-12 (1998) (citing Rova Farms Resort, Inc. v. Inv'rs Ins. Co.,

65 N.J. 474, 484 (1974)). Moreover, we accord even greater

deference to the judge's fact-finding "[b]ecause of the family

courts' special jurisdiction and expertise in family matters."

Id. at 413. We will not disturb the trial judge's factual findings

unless they are "so wide of the mark that a mistake must have been

 3 A-4671-14T1
made[,]" even if we would not have made the same decision. N.J.

Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007).

 "The balance between parental rights and the State's interest

in the welfare of children is achieved through the best interests

of the child standard." In re Guardianship of K.H.O., 161 N.J.

337, 347 (1999). Before parental rights may be terminated, the

Division must prove the following four prongs by clear and

convincing evidence:

 (1) The child's safety, health, or development
 has been or will continue to be endangered by
 the parental relationship;

 (2) The parent is unwilling or unable to
 eliminate the harm facing the child or is
 unable or unwilling to provide a safe and
 stable home for the child and the delay of
 permanent placement will add to the harm. Such
 harm may include evidence that separating the
 child from his resource family parents would
 cause serious and enduring emotional or
 psychological harm to the child;

 (3) The division has made reasonable efforts
 to provide services to help the parent correct
 the circumstances which led to the child’s
 placement outside the home and the court has
 considered alternatives to termination of
 parental rights; and

 (4) Termination of parental rights will not
 do more harm than good.

 [N.J.S.A. 30:4C-15.1(a); see also N.J. Div.
 of Youth & Family Servs. v. A.W., 103 N.J.
 591, 604-11 (1986).]

 4 A-4671-14T1
The factors "are not discrete and separate; they relate to and

overlap with one another to provide a comprehensive standard that

identifies a child's best interests." K.H.O., supra, 161 N.J. at

348.

 The trial judge conducted a fact-sensitive analysis of the

first three prongs.

 The judge's conclusions relevant to the first prong

dovetailed with his findings supporting the second prong, a common

occurrence resulting from the overlap of the two. N.J. Div. of

Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 88 (App. Div.

2006), certif. denied, 190 N.J. 257 (2007). The record supports

his ruling that the Division established these prongs.

 Dr. Charles Hasson was qualified at trial as an expert in

psychology. He performed evaluations, including psychological

testing and bonding evaluations on Mae and the children. Mae

described her upbringing to Dr. Hasson, and revealed to him her

mental health and substance abuse history. She also told him of

her plans to enroll in Essex County College, obtain her GED, get

a job and, then, an apartment. She admitted to the doctor that

she had difficulty getting motivated. Dr. Hasson opined at trial

 5 A-4671-14T1
that Mae

 has mood disorder, a depressive disorder.

 Whether it's chronic depression, major
 depression, it doesn't matter. There's a
 depressive disorder there right, but more
 importantly pushing her behavior is the fact
 that she doesn't know where she's heading in
 life. There's a character disorder, so it's
 hard for her to get organized, to get in gear,
 to get things accomplished. And to provide
 . . . a safe, and nurturing environment for
 her children rather than taking responsibility
 for her own . . . mistakes.

He testified that marijuana use "de-motivate[s] people," and that,

considering Mae's mental health status and her admitted abuse of

marijuana, "the last thing she should rely on is marijuana."

 The judge concluded that Mae was continuing the cycle of poor

parenting to which she had been subjected. Belying Mae's

contentions that the boys were well-fed, had appropriate housing

and were attending school without issue, the judge noted instances

of: physical and emotional abuse; behavior problems at school; and

grooming and cleanliness issues. Crediting Dr. Hasson's

testimony, the judge found Mae has severe psychological issues

that rendered her incapable of parenting "now or in the foreseeable

future." He observed that "she has not changed her situation, she

has not bettered it[, and] she has not dealt with the issues that

have seriously [prevented] her from being a parent for these

children." He found that, despite almost three years of out-of-

 6 A-4671-14T1
home placement,3 Mae was still unable to provide a stable home and

was without a stable job, and that her stated plans to obtain same

and continue her education were "pie in the sky." If the children

were returned to her, he said "they would be taught the same

lessons that she learned from her mother and her treatment when

she grew up." He declared the "cycle" had to stop.

 These conclusions were not, as contended by Mae, based on

unsubstantiated hearsay, whether contained in the trial record or

relied on by Dr. Hasson. Mae's admissions to the doctor formed

the basis for these findings, and the judge properly ruled there

was clear and convincing evidence to establish the first and second

prongs.4

 The trial judge determined that the State's burden with regard

to the third prong was met because, notwithstanding the Division's

provision of services to the family for ten years, Mae made no

progress in providing stability and security for the boys.

3
 The boys were placed in out-of-home care from October 2, 2012
through the trial in June 2015.
4
 We deem Mae's argument that the court's analysis was flawed
because the Division's expert report was unreliable to be without
sufficient merit to warrant discussion in a written opinion. R.
2:11-3(e)(1)(E). The judge's decision did not rest on the portions
of the report cited by Mae in her brief. Further, the doctor's
report aids Mae's argument that she was bonded with Jason, and
that termination would be difficult for him; Mae had no issue
referencing those portions of the doctor's opinion.

 7 A-4671-14T1
Substantial evidence in the record supports his terse finding.

The Division offered Mae programs for drug treatment, anger

management, parenting skills, childcare and homemaking, as well

as in-home monitoring services.

 Although finding her "compliance is somewhat questionable,"

the judge acknowledged that Mae attended services. Nonetheless,

 [a]nd unfortunately, we are [twelve] years
 into Division history and it isn't a better
 situation at this point . . . . But there's
 no change in [her] life. There's no
 motivation, there's no apartment, there's no
 job, there [is] n[o] education, there's
 nothing that she has done in the years and
 years and years the Division[] [has] been
 involved, that has changed her situation one
 iota.

 Mae continued drug use even after completion of treatment.

She asserts, because of her participation in drug rehabilitation,

she was not able to attend other programs, visit with the children

and work. But she was not working during much of that period.

And when she did work – in September through November 2013 – she

told the Division that work interfered with her attendance at drug

treatment and other services, a complaint she echoes on appeal.

The Division, however, tried to find programs to accommodate her

work schedule.

 There is compelling evidence Mae simply failed to avail

herself of the services offered by the Division. Mae admitted to

 8 A-4671-14T1
Dr. Hasson that her lack of motivation was a major problem, a

problem he said was exacerbated by her marijuana use. The judge

found Mae had not "dealt with the issues" that impeded her

parenting abilities. Although Mae now complains the Division did

not help her find housing, she and her counsel consistently

represented to the court that she was on the verge of obtaining a

subsidized apartment. Further, defendant refused to look at one

residence suggested by a service provider and failed to follow up

with that provider's housing office. We conclude the judge's

finding that the Division made reasonable efforts to provide

services over a number of years was amply supported.

 In deciding whether the Division met its burden with regard

to the fourth prong, the judge was not presented with perfect

alternatives. He noted Mae's "total rejection" of Jack made him

"an orphan in the house." And although, as Dr. Hasson opined, she

had a strong bond with Jason, the judge found the boys would have

"no future" if they were returned to Mae because she had not

resolved the problems stemming from her "severe psychological

issues" and drug use, and that "now and for the foreseeable future"

she would be

 incapable of parenting for these children and
 will only repeat the procedures . . . and the
 abuse and neglect that she has . . . put upon
 them. Their behavior is not going to improve,

 9 A-4671-14T1
 it's going [to] . . . get worse . . . if they
 go back [to her].

The judge heeded the Court's mandate in K.H.O. and considered the

"realistic likelihood that the [natural] parent will be capable

of caring for the child in the near future," 161 N.J. at 357, and

found none.

 The judge weighed the impact termination had on Jack, and

observed that Jack had shown improvement since removal. Dr. Hasson

testified Jason would be upset by the termination of Mae's rights,

and that he would be confused and act out. Nonetheless, he felt

termination would be in Jason's best interest, calling it "a

question of the lesser of evils." The judge reached the same

conclusion.

 The judge fully realized that if Mae's rights were terminated,

there was no plan in place for adoption, querying:

 What are the possibilities if we don't
 terminate parental rights? What is the plan
 for these children? To stay in foster homes?
 To stay in homes that are not willing to adopt?
 To stay in specialized care? What is the
 possibility of ever reaching permanency,
 security, safety and the type of home that
 these children are entitled to?

 Considering Mae had not addressed the issues that led to her

sons' removal after many years of Division intervention, and still

had not found stable housing, stable employment or sobriety, the

judge properly considered the boys' need for "permanency and

 10 A-4671-14T1
stability," see ibid., and found "there is no other viable

alternative in this case" other than select home adoption – an

option he found less than ideal. He continued:

 But, even if that doesn't work out, their
 only, it's not the best, it's the only
 possibility of permanency, security, of
 finding an adoptive home is to terminate
 parental rights. There's no way you can find
 an adoptive home for these children unless you
 terminate parental rights.

 Time was a factor in the court's decision. The judge found

there was a "small window" to "get these children into an

appropriate home . . . that will love and care for them, provide

them permanency" so their "behavior will improve once they heal

and get to a place where they . . . can be understood and loved

and . . . get the appropriate attention."

 Notwithstanding Mae's arguments that both boys expressed a

desire to live with her, that Jason was bonded to her and, in

fact, did act out after removal, and that the Division had not

found adoptive homes, giving due deference to the judge's findings,

N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448-49

(2012), we conclude the judge did not err in finding the Division

provided clear and convincing evidence as to the fourth prong.

The Division proved all four prongs and termination was properly

ordered.

 11 A-4671-14T1
 Mae and the law guardian also challenge the judge's denial

of the law guardian's motion for relief from the court's

termination of parental rights. The judge held hearings over two

days. He weighed the contentions advanced by the law guardian and

Mae that termination would do more harm than good. Regarding

Jason, his foster mother no longer wanted to adopt him because,

as anticipated by Dr. Hasson, his behavioral problems escalated

after termination; he was performing poorly in school; and he

maintained a desire to be with his mother. Regarding Jack, he was

stepped down to a group home, his behavior had improved, and he

now wanted to be returned to Mae's home. The judge agreed,

however, with the Division's argument that Mae was in no better

position to care for and provide permanency for the boys. He

noted she still did not have stable housing, and had "negligible"

employment which was inadequate to support herself alone, much

less the boys. He recognized that mother and sons had successful

visitation sessions, but there was nothing before him that showed

Mae was better able to care for the children.

 Mae reasserts the same points on appeal, arguing that the

fourth prong was not proved by clear and convincing evidence,

chiefly because the boys expressed their desire to be reunified

with Mae, and have still not been placed in a permanent setting.

Likewise, the law guardian reiterates the contentions she

 12 A-4671-14T1
presented to the trial judge, noting that the record is barren of

proof that the Division's search for adoptive homes will be

fruitful; hence the boys "face an uncertain future with no

permanency in sight." The Division counters that Jason "continues

in the same resource home" where he has resided for over four

years, and Jack "continues to receive services and was stepped

down from his residential placement" to a group home.

 "Courts should use Rule 4:50-1 sparingly, in exceptional

situations." Hous. Auth. of Morristown v. Little, 135 N.J. 274,

289 (1994). In a termination of parental rights case, "[w]here

the future of a child is at stake, there is an additional weight

in the balance: the notion that stability and permanency for the

child are paramount." J.N.H., supra, 172 N.J. at 474-75 (citing

K.H.O., supra, 161 N.J. at 357-58). "Thus, in determining a Rule

4:50 motion in a parental termination case, the primary issue is

. . . what effect the grant of the motion would have on the child."

Id. at 475. Further, "the passage of time in a parental

termination case, especially where a child has successfully

adjusted to a long term placement, is of much greater significance

than it would be in practically any other context." Ibid. A

trial court's decision on a motion under Rule 4:50-1 "will be left

undisturbed unless it represents a clear abuse of discretion."

Little, supra, 135 N.J. at 283.

 13 A-4671-14T1
 We recognize that great harm can result if termination is

ordered "without any compensating benefit, such as adoption," and

that "[s]uch harm may occur when a child is cycled through multiple

foster homes" following termination. N.J. Div. of Youth & Family

Servs. v. E.P., 196 N.J. 88, 109 (2008). But a child's need for

permanency and stability is a "central factor" in these cases.

K.H.O., supra, 161 N.J. at 357.

 Based on the circumstances, the judge, after concluding Mae

was incapable of parenting, found termination to be the boys' only

chance for permanency. If Mae had made progress in addressing the

issues that prevented her from offering her sons a stable

environment, she may have offered a better alternative than the

resource and group homes in which the boys then resided. E.P.,

supra, 196 N.J. 109-11. The post-trial changes did not present

the judge with a viable option to termination. Although the boys

were not adopted, Jason remained in the same foster home; Jack's

situation, although changed, improved; and Mae's situation did

not. The judge's denial of the motion for relief from judgment

was not wide of the mark or clearly mistaken to warrant our

intervention; it was a measured and supported decision.

 We have considered the law guardian's report at oral argument

regarding the status of the boys. Neither child has been adopted.

Jack is living in a treatment home and has a goal of independent

 14 A-4671-14T1
living. Jason's residence changed in May. The goal set for him

is select home adoption. Both Jack and Jason no longer want to

be reunited with Mae.5 We do not view these changes, especially

since there is no evidence Mae's situation changed from that found

by the trial judge, as requiring a remand for further review by

the court. Such a proceeding may hamper the Division's efforts

to find permanency for Jack and Jason, and there are no grounds

to order such relief.

 Affirmed.

5
 Although a child's wishes is "but one factor" in deciding the
best interests of a child, as our Supreme Court observed, they
"may often not be in their own best interests." E.P., supra, at
113.

 15 A-4671-14T1