# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2020-22

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

     Plaintiff-Respondent,

v.

M.B. and A.M.,

     Defendants,

and

C.A.M.,

     Defendant-Appellant.

_____

IN THE MATTER OF R.M.,
S.M., and A.M., minors.

_____

     Submitted June 4, 2024 – Decided July 1, 2024

     Before Judges Smith and Perez Friscia.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FN-07-0103-22.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (David A. Gies, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Sookie Bae-Park, Assistant Attorney General, of counsel; Renee Greenberg, Deputy Attorney General, on the brief).

Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney for minors (David B. Valentin, Assistant Deputy Public Defender, on the brief).

PER CURIAM

Defendant, C.A.M.[1] (Caden or defendant) appeals from an August 10, 2022 order of the Family Part finding he abused and neglected his stepdaughter S.M. (Stella). We affirm for the following reasons.

I.

M.B. (Maisie) is the mother of Stella, R.M. (Rhys), and A.M. (Aimee). Maisie began a relationship with Caden, the father of Aimee, in 2018. Maisie's former boyfriend A.M. (Albert), who is the father of Stella and Rhys, resided in

---

[1] We use initials and fictitious names for the parents and children to protect their privacy and the confidentiality of the record. R. 1:38-3(d)(12).

A-2020-22

Florida.[2]  Maisie, Caden, and the three children lived together in an apartment in Newark.

On September 29, 2021, Maisie reported to police that Caden hit her, and the police made a referral to the Division of Child Protection and Permanency (DCPP) because Maisie reported Aimee witnessed the assault.  Maisie and the children went to stay with her sister in Jersey City.  Aminah Ahmad, a DCPP caseworker, visited the family the following day to begin the Division's investigation.  During the visit, Maisie told the caseworker that her mother (Stella's maternal grandmother) and sister (Stella's maternal aunt) told her that Stella, who was seven years old,[3] disclosed Caden had been sexually assaulting her.  Maisie reported that Stella told the maternal grandmother and aunt Caden "puts his private on her while he touches his private part and makes her sit on his lap."

The caseworker then interviewed Stella privately, who reported Caden wakes her up at night and brings her to the bathroom, and that he started waking her up "in the summer."  When asked what happens when she goes into the

---

[2] No findings were made against Maise or A.M. and they are not parties to this appeal.

[3] Stella was born in December 2013.

bathroom with Caden, Stella answered that he makes her watch "nasty" stuff on his phone, and makes her undress, sit on his private part and he "moves up and down." Stella added that "it hurts" because "his private part goes in a little bit." That night, Maisie reported the assault to police, stating that Stella told the maternal grandmother Caden started assaulting her in September 2020 and continued until "the summertime." Stella was not taken to a hospital for examination.

DCPP's next in-home visit was November 10, 2021, during which the caseworker observed the children playing together and both Stella and Rhys reported they felt safe in their mother's care. When asked about Stella's behavior, Maisie reported that she has been fine but has an addiction problem with using her cell phone and playing mobile games that is causing issues with school and sleep.

DCPP conducted another home-visit on December 9, 2021, by which time Maisie had moved with the children back to Newark to an apartment next door to Caden, although Maisie said she was looking for a new home. Maisie told the caseworker that Stella recanted her allegations. The caseworker interviewed Stella in private, and when asked if she remembered the conversation they had she replied "yes, he didn't do anything to me, we didn't live with him." Stella

could not answer why she told the caseworker the story she did, and when asked if someone told her to say that Caden didn't do what she reported he did, she did not respond. The caseworker also interviewed Maisie, who said she had been in contact with Caden, who lived next door. Maisie told the caseworker that Caden understood that he couldn't see or speak to the children.

When caseworkers visited on February 9, 2022, Maisie said she had been in contact with Caden and admitted Caden had contact with Aimee but denied that he had any contact with Stella. Maisie also stated that she was waiting to schedule a forensic video interview (FVI) with Stella, which the police eventually scheduled for February 17, 2022 at the Essex County Prosecutor's Office.

On February 16, 2022, a social worker at Stella's school made a referral to DCPP, reporting that Stella told a teacher her whole body hurt, and that her stepdad has been having sex with her every day. Stella also stated Caden had been putting his hands down her pants while her mom was sleeping. Stella told the teacher her mom knows and "is taking [her] to the police station tomorrow to say it never happen[ed]." A caseworker responded to the school to interview Stella. Stella said she knew the caseworker was there because "her 'daddy' touches her in her privates and that it happens every day."

A-2020-22

When asked what was happening the next day, Stella said her mother was taking her to talk to the police. She then said that her mother told her to say nothing happened, because if she talked, she would end up in foster care and not see her brother or sister again. Stella also said her mother promised her "Robux"[4] if she told the police nothing happened. When interviewed by caseworkers, Maisie denied threatening Stella with foster care, but did admit she told Stella "Tomorrow is a big day," and not to tell people their family business.

The following day, Stella was interviewed by investigators at the Essex County Prosecutor's Office. During the FVI, Stella stated that Caden touched her genitals with his hands as he took off her clothes while her family was asleep. She also reported that Caden licked her genitals in the kitchen of the apartment. She further disclosed Caden made her sit on his genitals while he sat on the bathtub in the bathroom and that his private part went inside her. When asked, Stella described Caden's penis as "hard." She stated that he made her sit on his penis until he was "finished." When asked what finished meant, Stella said she didn't know, but said that there was yellow, sticky stuff that got on her hand, and she did not like it.

---

[4] Robux is the virtual currency used in the online gaming platform "Roblox."

On February 23, 2022, DCPP initiated a child-protection action under N.J.S.A. 9:6-8:21 and N.J.S.A. 30:4C-12 seeking care and supervision of the three children.

On March 1, 2022, Stella was evaluated by licensed psychologist Diane E. Snyder, Ph.D. Prior to her evaluation, Dr. Snyder viewed Stella's FVI, interviewed the DCPP caseworker, and reviewed the division's records. At the outset of the evaluation, Dr. Snyder established that Stella knew the difference between a truth and a lie and asked her if she agreed to tell the truth. Stella did not agree, and Dr. Snyder understood her response to mean that there were certain things that Stella would not talk about, and not that Stella would be untruthful about the things she would talk about.

Dr. Snyder observed Stella as "a listless, possibly depressed child, who spoke in a low tone." Stella told Dr. Snyder that Caden touched her private part with his hand "a lot . . . 100 days" and that he touched her genital area with his "part" "a lot of times . . . 100 times." Stella described Caden sitting on the edge of the bathtub naked and Stella on his lap, face to face. Stella explained, "I was looking at the bathtub," clarifying that she did not look at Caden. Stella stated that Caden would make her touch his penis. Stella said that these incidents took place in the bathroom at night when her mother was asleep. When asked about

exposure to sexually explicit material, Stella confirmed, "Dad showed me a lot." Stella told Dr. Snyder that Caden's penis went inside her and that a white liquid would come out of his penis.

Dr. Snyder asked a series of questions to assess whether Stella was experiencing any problem behaviors. Stella said that she worries about herself but couldn't articulate what she was worried about. Stella reported it takes her "20 hours" to fall asleep, and that she experiences recurrent intrusive thoughts regarding the sexual abuse multiple times per day, every day. Dr. Snyder's report indicated that due to Maisie's current non-support of the abuse allegations, Stella was at risk of recantation. Dr. Snyder's report concluded with a diagnosis of post-traumatic stress disorder.

A Title Nine hearing was held on August 10, 2022. The parties stipulated to the authenticity of the FVI and agreed to watch it outside the courtroom. Dr. Snyder testified as an expert in psychology and child abuse and neglect for the Division. Dr. Snyder testified consistent with her report and recounted the allegations Stella described. In regard to Stella's indication that she was not willing to tell the truth about some things, Dr. Snyder testified that she regularly asked Stella throughout the evaluation whether what she was saying was a true or a lie. Twice Stella responded that a topic was something she was not willing

to talk about: whether her mother or stepfather drinks alcohol, and whether there were other bad things that happened to her. When asked about the allegations she previously made, Dr. Snyder testified Stella indicated that she would truthfully report "some things" but would not report everything he did to her.

In regard to Stella's comments that the abuse happened "a lot, 100 times" and whether that was exaggeration, Dr. Snyder testified that it was her opinion this was "child speak," which is common when children want to express something happens a lot: "it's a gazillion times, it's a hundred billion times, it's a lot. It's every day. It's a thousand times a day." Dr. Snyder testified that in her opinion, using this language would not cause her to think it was an unreliable statement.

Dr. Snyder also testified that Stella's knowledge of sexual details was precocious for an eight-year-old. Dr. Snyder testified that "her described experience and [during] her FVI . . . she's having an a-typical experience for an [eight]-year-old. She had ejaculate on her hand and she's saying I had to get [it off my hand]." Dr. Snyder further testified that describing the penis as hard would not be common knowledge for a child.

Aminah Ahmad, the DCPP caseworker assigned to Stella's case, also testified. She testified about Stella's September 2021 and February 2022

disclosures of sexual abuse by Caden. She testified that Stella reported that her mother warned if she said something happened "DYFS would take her away and that if she [did not] she will give her Robux."

Following the hearing, the court found DCPP showed by a preponderance of the evidence that Stella was abused or neglected. The court found Stella's out-of-court statements regarding sexual abuse were corroborated by: the expert opinion and diagnosis of post-traumatic stress disorder (PTSD) by Dr. Snyder; her consistent statements made to multiple sources; and the precocious sexual knowledge exhibited when describing the abuse. Specifically, the court found that Stella's descriptions of oral sex, Caden's penis being hard, and "the color [and] the texture of the ejaculate" was precocious knowledge an eight-year-old would otherwise not know. The court also credited the testimony of Dr. Snyder and her diagnosis of PTSD.

Defendant raises the following points on appeal:

> I. THE FAMILY PART JUDGE'S DETERMINATION THAT THE EIGHT-YEAR OLD'S OUT-OF-COURT STATEMENTS WERE CORROBORATED IS NOT SUPPORTED BY THE RECORD.
>
> > A. The eight-year-old's unreliable out-of-court statements do not corroborate her sexual abuse allegations through either consistency or precocious knowledge.

10

B. The Family Part judge erred by relying on the child abuse psychologist's expert opinion that the eight-year-old suffered from PTSD as corroboration of the child's out-of-court statements.

## II.

### A.

"[W]e accord substantial deference and defer to the factual findings of the Family Part if they are sustained by 'adequate, substantial, and credible evidence' in the record." N.J. Div. of Child Prot. & Permanency v. N.B., 452 N.J. Super. 513, 521 (App. Div. 2017) (quoting N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014)). We ordinarily accord such deference because of the Family Part's "special jurisdiction and expertise," N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)), and its "opportunity to make first-hand credibility judgments about the witnesses . . . [and have] a 'feel of the case' that can never be realized by a review of the cold record," N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 293 (2007)).

"Nevertheless, if the trial court's conclusions are 'clearly mistaken or wide of the mark,' an appellate court must intervene to ensure the fairness of the

11

proceeding." N.J. Div. of Youth & Fam. Servs. v. L.L., 201 N.J. 210, 226-27 (2010) (alteration in original) (quoting E.P., 196 N.J. at 104). We owe no deference to the trial court's legal conclusions, which we review de novo. N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 369 (2017).

B.

Under N.J.S.A. 9:6-8.21(c), an abused or neglected child is one whose parent or guardian:

> (3) commits or allows to be committed an act of sexual abuse against the child; (4) or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian . . . to exercise a minimum degree of care . . . (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof . . . .

"Abuse and neglect cases 'are fact-sensitive.'" N.J. Div. of Child Prot. & Permanency v. E.D.-O., 223 N.J. 166, 180 (2015) (quoting N.J. Div. of Youth & Fam. Servs. v. T.B., 207 N.J. 294, 309 (2011)). "The Division bears the burden of proof at a fact-finding hearing . . . ." N.J. Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 22 (2013) (citing N.J.S.A. 9:6-8.46(b)). To prevail in a Title Nine proceeding, DCPP must show by a preponderance of the "competent, material and relevant evidence" that the parent or guardian abused or neglected

the affected child.  N.J.S.A. 9:6-8.46(b); accord N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 32 (2011) (quoting N.J.S.A. 9:6-8.46(b)).  There must be "proof of actual harm or, in the absence of actual harm," through "competent evidence adequate to establish [the child was] presently in imminent danger of being impaired physically, mentally or emotionally."  N.J. Div. of Youth & Fam. Servs. v. S.I., 437 N.J. Super. 142, 158 (App. Div. 2014) (citation omitted).

N.J.S.A. 9:6-8.46(a)(4) provides that "previous statements made by the child relating to any allegations of abuse or neglect shall be admissible in evidence; provided, however, that no such statement, if uncorroborated, shall be sufficient to make a fact finding of abuse or neglect."  "A child's statement need only be corroborated by '[s]ome direct or circumstantial evidence beyond the child's statement itself.'"  N.J. Div. of Child Prot. & Permanency v. A.D., 455 N.J. Super. 144, 156 (App. Div. 2018) (quoting N.B., 452 N.J. Super. at 522).  "The most effective types of corroborative evidence may be eyewitness testimony, a confession, an admission or medical or scientific evidence."  Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. L.A., 357 N.J. Super. 155, 166 (App. Div. 2003)).  Such indirect evidence has included "a child victim's precocious knowledge of sexual activity, a semen stain on a child's blanket, a

13

child's nightmares and psychological evidence." N.J. Div. of Child Prot. & Permanency v. I.B., 441 N.J. Super. 585, 591 (App. Div. 2015) (quoting N.J. Div. of Youth & Fam. Servs. v. Z.P.R., 351 N.J. Super. 427, 435 (App. Div. 2002)). Evidence of "age-inappropriate sexual behavior" can also provide the necessary corroboration required under N.J.S.A. 9:6-8.46(a)(4). Z.P.R., 351 N.J. Super. at 436.

### III.

Defendant argues the court's finding of abuse and neglect is not supported by the record because Stella's allegations were not sufficiently corroborated. Defendant argues: Stella's out-of-court statements were unreliable and inconsistent because she recanted her allegations; Stella did not agree to tell the truth in her evaluation with Dr. Snyder; Stella's allegations are inconsistent because she did not inform any source other than the FVI interviewer that Caden engaged in oral sex with her; the conclusion Stella's sexual knowledge was precocious is problematic because she had access to the internet and could have viewed sexual material on her cell phone; and Dr, Snyder's report was not reliable. We are unpersuaded.

Stella's out-of-court statements consistently described sexual abuse by Caden. Stella made several out-of-court statements, first disclosing abuse to her

family and the DCPP caseworker in September 2021. Stella next reported allegations to school staff and a DCPP caseworker in February 2022. Stella then subsequently reported abuse in her February 2022 FVI and March 2022 evaluation with Dr. Snyder. Each time, Stella reported Caden would take her into the bathroom, pull down her pants, touch her genitals, and make her sit on his lap. Stella's disclosure of an additional detail regarding oral sex to Dr. Snyder does not render her allegations inconsistent.

Additionally, defendant's assertion that Stella's statements to Dr. Snyder are unreliable because Stella would not agree to be truthful mischaracterizes Dr. Snyder's report and testimony. Dr. Snyder indicated that she understood Stella to mean that she would not disclose everything that had happened but would truthfully discuss topics she was willing to talk about. Dr. Snyder addressed this by frequently checking with Stella to see if she was being truthful. Notably, this understanding of Stella's comments is supported by her refusal to talk about certain subjects such as her parents' alcohol usage and other bad things that may have happened.

Similarly, defendant's argument that Stella's statements are unreliable because she recanted is unpersuasive. DCPP's investigation first revealed that Maisie reported that Stella had recanted, and when asked Stella responded "yes,

he didn't do anything to me, we didn't live with him" but would not respond to follow up questions. However, Stella later re-alleged the same abuse to her teacher, the prosecutor's office, and Dr. Snyder. Additionally, Dr. Snyder's report noted that Stella was at risk of recantation due to Maisie's lack of support of her allegations. Most notably, Stella told DCPP staff that Maisie told her if she said Caden abused she would be placed in foster care, while if she did not, she would be given Robux. Indeed, Maisie admitted telling Stella not to tell others "family business." The trial court's finding that Stella did not recant is supported by the record.

The record also supports the trial court's finding that Stella's out-of-court statements were sufficiently corroborated. First, Stella's statements included detailed descriptions of abuse and precocious sexual knowledge that are a-typical for an eight-year-old. See Z.P.R., 351 N.J. Super. at 436 ("[W]e have no doubt that evidence of age-inappropriate sexual behavior could provide the necessary corroboration required by N.J.S.A. 9:6–8.46a(4)."). The court's finding that Stella's sexual knowledge—which included description of the color and texture of ejaculate, how his penis felt hard, and a description of oral sex— was beyond that of a typical eight-year-old is supported by the record. Defendant's argument that Stella could have been exposed to sexual content on

the internet is mere speculation, and defendant has not offered any evidence that Stella was viewing such material on her own.

Second, the court properly relied on the unrebutted expert report and testimony of Dr. Snyder. The court's determination finding Dr. Snyder's testimony credible is entitled to substantial deference. See E.P., 196 N.J. at 104 (2008) (quoting M.M., 189 N.J. at, 293). Dr. Snyder's opinion included a diagnosis of PTSD based on: an allegation of sexual violence; recurrent intrusive thoughts; sleep disturbances; and an observed cognitive or mood disturbance. See I.B., 441 N.J. Super. at 591 (quoting Z.P.R., 351 N.J. Super. at 435). While defendant argues that the diagnosis of PTSD did not consider the "other things" Stella did not wish to talk about, her report did clearly indicate that her recurrent intrusive thoughts involved "all the things (sex abuse) he ([Caden]) did."

Stella's out-of-court statements, corroborated by her precocious knowledge and Dr. Snyder's expert opinion, sufficiently established abuse and neglect by a preponderance of the evidence.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2020-22