# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2334-23

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

    Plaintiff-Respondent,

v.

S.C. (deceased), G.C. and C.J.,

    Defendants,

and

N.C.,

    Defendant-Appellant.

_____

IN THE MATTER OF C.C.,
a minor.

_____

      Submitted May 27, 2025 – Decided July 11, 2025

      Before Judges Gooden Brown and Smith.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FN-07-0058-24.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Laura M. Kalik, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Donna Arons, Assistant Attorney General, of counsel; Meaghan Goulding, Deputy Attorney General, on the brief).

Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

N.C.[1] (Natalie) appeals from a February 22, 2024 Family Part order finding that she abused or neglected C.C. (Caleb), her minor brother, in violation of N.J.S.A. 9:6-8.21(c)(4). Based on our thorough review and application of prevailing law, we reverse.

## I.

We discern the salient facts from the limited record developed at the fact-finding hearing. At the hearing, the Division of Child Protection and

---

[1] We use initials and pseudonyms to protect the privacy of the family. R. 1:38-3(d)(12).

Permanency (the Division) proffered Marcia Ho-on, an investigator and family service specialist with the Division. Natalie testified in her own defense.

Caleb is the son of S.C. and C.J., and brother to Natalie. After S.C.'s passing, Caleb's maternal great aunt, G.C., and Caleb's great grandmother adopted Caleb and his brother. However, upon allegations that the brothers were being abused, the Family Court of the State of New York granted Natalie custody over the two on January 29, 2019. Natalie was twenty-nine years old and Caleb was sixteen at the time of the incident that precipitated this case.

Natalie testified at the fact-finding hearing that she does not allow Caleb to stay alone in her home and that she does not provide Caleb with a house key. She alleged that Caleb had stolen from her and could not be trusted in the house. Caleb alleged that when he was not permitted to be in the house, he would either go to a local gym or sit outside on a park bench. On Saturday, September 30, 2023, Caleb wanted to go to the gym while Natalie was at work. Natalie requested that Caleb come with her, because Caleb had lost his phone and would not be able to stay in contact with her while she was at work. Natalie planned on having Caleb stay in her car during her five-hour shift. Caleb refused to go with Natalie, so she contacted the Newark Police Department.

A-2334-23

When an officer arrived and told her that she could not leave Caleb alone, Natalie informed her manager that she would not be working that day. Natalie then tried to get Caleb to go grocery shopping, but he refused to go with her. Natalie told the officer that she did not know what to do with Caleb if he did not come with her. The officer took Caleb to a local police precinct and made a referral to the Division.

Natalie also contacted the Division, informing them of the incident and that she no longer wanted Caleb in her home. She stated that she was concerned for her safety, given that Caleb, who was six feet, two inches tall, and weighed between 280 and 300 pounds, had allegedly put her in a choke hold, hit her in the face, and thrown a glass at her. Later in the day, the Division contacted Natalie. During the call, Natalie stated that she could not make a plan for Caleb because he did not want to come back home with her and she did not want him to return. Because she was working the following day and the same issue was going to arise, Natalie suggested that the Division contact one of Caleb's relatives to take him for the weekend. She provided the Division the contact information for G.C., C.J., and Caleb's brother. The Division contacted G.C. and C.J., but neither would take Caleb. The Division could not reach Caleb's brother.

The Division then interviewed Caleb at the police precinct. Caleb stated that he and Natalie did not get along and that he would rather be placed at a shelter. He alleged that Natalie would drink and bang on his door when intoxicated. The Division contacted a local YMCA shelter, which had an available room for Caleb. The Division determined that a Dodd removal[2] was necessary. The Division attempted to retrieve Caleb's clothes from Natalie, but she was not home.

The following day, Natalie provided the Division with Caleb's clothes and signed paperwork for the Dodd removal. The Division informed her that Caleb would be staying at the YMCA. The trial court upheld the Dodd removal of Caleb on October 2.

The Division filed an order to show cause and verified complaint to obtain custody over Caleb on October 3, 2023. The trial court granted the Division's request after a hearing that same day. The trial court continued the Division's custody of Caleb on October 20, 2023, and conducted a case management conference on November 30, 2023.

---

[2] A "Dodd removal" refers to the emergency removal of a child from a home without a court order, pursuant to the Dodd Act. See N.J.S.A. 9:6-8.21 to - 8.82.

A-2334-23

The court held a hearing on February 22, 2024 to determine whether Natalie's actions on September 30, 2023 constituted abandonment or abuse or neglect under Title Nine.[3] The court found both witnesses to be credible. After the hearing, the trial court, in an oral decision, found by a preponderance of the evidence that Natalie abused or neglected Caleb under N.J.S.A. 9:6-8.21(c)(4), but that she had not abandoned him under N.J.S.A. 9:6-8.21(c)(5).

On the issue of abandonment, the court found that

> [i]n the present case, [Natalie] left her then [sixteen-]year[-]old brother in the care of the police after refusing to let him return to her home. While leaving [Caleb] with the police and refusing to allow him to return to the home, causing the Division to assume custody of him is not an appropriate way to handle a difficult child and certainly fulfills some of the criteria of [N.J.S.A.] 9:6-1, the [c]ourt does not find . . . that [Natalie] has abandoned him as defined by the statute and the case law. The evidence does not support a finding that she intended to forever forsake [Caleb]. [Natalie] had a laps[e] in judgment, but her actions do not rise to the level of gross negligence or wil[l]ful and purpose[ful] abandonment.

As for abuse or neglect, the court determined that

> [Natalie]'s actions clearly demonstrate that she did not exercise a minimum degree of care. Leaving her brother in the care of the police or refusing to permit him to return to her home without a viable plan, regardless of his behavior, recklessly creates a risk of

---

[3] N.J.S.A. 9:6-1 to -8.114.

6

A-2334-23

harm. [Caleb] had no one to assist him with food, cleanliness[,] or shelter. Any ordinary prudent person would have understood that leaving him in the care of the police without any plan or providing him any funds on which to live unnecessarily placed a minor at great risk of harm.

The trial court ordered that Natalie be placed on the Child Abuse Registry[4] and dismissed her from the case. Natalie appeals, arguing that the trial court: relied on insufficient evidence to find that she had neglected or abused Caleb; and improperly relied on inadmissible hearsay.

II.

"[W]e accord substantial deference and defer to the factual findings of the Family Part if they are sustained by 'adequate, substantial, and credible evidence' in the record." N.J. Div. of Child Prot. & Permanency v. N.B., 452 N.J. Super. 513, 521 (App. Div. 2017) (quoting N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014)). We ordinarily accord such deference because of the Family Part's "special jurisdiction and expertise," N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)), and its "opportunity to make first-hand credibility judgments about the witnesses . . . [and have] a 'feel of the case' that can never be realized

---

[4] N.J.S.A. 9:6-8.11.

by a review of the cold record," N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 293 (2007)).

"Nevertheless, if the trial court's conclusions are 'clearly mistaken or wide of the mark[,]' an appellate court must intervene to ensure the fairness of the proceeding." N.J. Div. of Youth & Fam. Servs. v. L.L., 201 N.J. 210, 226-27 (2010) (alteration in original) (quoting E.P., 196 N.J. at 104). We owe no deference to the trial court's legal conclusions, which we review de novo. N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 369 (2017).

"Abuse and neglect actions are controlled by the standards set forth in Title Nine of the New Jersey Statutes." N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 31 (2011). The purpose of a fact-finding hearing is "to determine whether the child is . . . abused or neglected . . . ." N.J.S.A. 9:6-8.28(a), -8.3(a), -8.32. "If the facts are sufficient to sustain the complaint, the court will enter an order finding that the child is an abused or neglected child and set forth the ground for such finding." N.J. Div. of Youth & Fam. Servs. v. N.S., 412 N.J. Super. 593, 615 (App. Div. 2010) (citing N.J.S.A. 9:6-8.50(a)). In making a fact finding of abuse or neglect, a court considers "the totality of the circumstances, since '[i]n child abuse and neglect cases the elements of proof

are synergistically related.'" N.J. Div. of Youth & Fam. Servs. v. V.T., 423 N.J. Super. 320, 329 (App. Div. 2011) (alteration in original) (quoting N.J. Div. of Youth & Fam. Servs. v. C.H., 414 N.J. Super. 472, 481 (App. Div. 2010)).

> Pursuant to N.J.S.A. 9:6-8.21(c)(4)(a), in order to substantiate an abuse or neglect finding, the Division must prove that a child's "physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired" due to the parent's failure to "exercise a minimum degree of care . . . in supplying the child with adequate food, clothing, shelter, education, medical or surgical care."
>
> [N.J. Div. of Child. Prot. & Permanency v. B.P., 257 N.J. 361, 366 (2024).]

The statute does not require a child to experience actual harm. N.J. Dep't of Child. & Fams., Div. of Child Prot. & Permanency v. E.D.-O., 223 N.J. 166, 178 (2015). Recently, our Supreme Court held in Title Nine cases, "[a]bsent proof of actual impairment, 'the critical focus is on evidence of imminent danger or substantial risk of harm.'" B.P., 257 N.J. at 376 (quoting N.J. Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 22 (2013)). The danger to a child must be imminent, and "the mere possibility of a child being impaired is [in]sufficient." Id. at 379.

"'[M]inimum degree of care' refers to conduct that is grossly or wantonly, negligent, but not necessarily intentional." G.S. v. Dep't of Human Servs., 157

N.J. 161, 178 (1999). "Conduct is considered willful or wanton if done with the knowledge that injury is likely to, or probably will, result." Ibid. (citing McLaughlin v. Rova Farms, Inc., 56 N.J. 288, 305 (1970)). To that end, a parent "fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." Id. at 181. "When a cautionary act by the [parent] would prevent a child from having his or her physical, mental or emotional condition impaired, that [parent] has failed to exercise a minimum degree of care as a matter of law." Id. at 182.

"Thus, under a wanton and willful negligence standard, a person is liable for the foreseeable consequences of [her] actions, regardless of whether she actually intended to cause injury." Id. at 179. "[T]he inquiry should focus on the harm to the child and whether that harm could have been prevented had the [parent] performed some act to remedy the situation or remove the danger." Id. at 182. If a parent's act or omission does not meet the "minimum degree of care" required by law, the substantiated finding must stand. Ibid.; see also N.J. Div. of Youth & Fam. Servs. v. T.B., 207 N.J. 294, 306-09 (2011) (reaffirming the G.S. test).

With these legal principles in mind, we turn to the arguments raised on appeal. The Division argues that there was sufficient evidence "establishing that [Natalie] placed Caleb at imminent risk of harm when she refused to allow Caleb home and left him with the police without a plan." The Division contends that, "[t]o avoid substantial harm, [it] was compelled to assume custody of Caleb" and place him in a shelter. The Law Guardian, joining the Division, argues that "[t]he risks involved in not furnishing or arranging to provide shelter for a child do not need further elucidation. [Natalie] clearly put Caleb in a dangerous situation when she refused to provide shelter." The Law Guardian analogizes this case with A.B. to argue that "the risks of barring a sixteen-year-old child from the family home are obvious and constitute a failure to exercise a minimum degree of care placing the child's physical, mental, and emotional condition at risk of being impaired." We disagree.

In A.B., we found that a mother abused or neglected her sixteen-year-old daughter who had recently given birth when she failed to report her daughter had run away and refused to permit her daughter to return to the family home. 231 N.J. at 358, 370. We rejected the mother's argument that the trial court had failed to make findings as to the imminent danger to the child because "the risks

11

inherent in barring a sixteen-year-old child from the family home without arranging any alternative source of shelter or support [were] obvious." Id. at 360. The Supreme Court affirmed our reasoning on appeal. Id. at 371.

The inherent risks present in A.B. cannot be found here. The child in A.B., identified as A.F., was a sixteen-year-old girl who had just given birth, with all the physical, mental, and emotional challenges that attend such an event. Caleb, also sixteen years old, faced uniquely different circumstances. The record shows that, unlike A.F., Caleb was not permanently barred from returning to Natalie's home prior to the incident. The only times that Natalie did not permit Caleb in her home were when she was not there. It was only after Caleb was in the care of the police that Natalie told the Division that she did not want Caleb to return to her home because she was afraid of him. Caleb also made clear to the Division that he did not wish to return to Natalie's home and preferred to be placed in a shelter. Natalie provided the Division with the contact information of individuals who might be able to care for Caleb, and the Division was able to find shelter for Caleb the same day the incident occurred. The record shows that the Division conducted a Dodd removal of Caleb on September 30 and that Natalie signed the requisite Dodd paperwork on October 1.

The facts of this case are more analogous to B.P. In B.P., the Supreme Court found a mother had not abused or neglected her newborn child when she left her infant at the hospital where she had been delivered and provided an incorrect phone number and a non-existent home address. 257 N.J. at 365. The Court concluded this conduct did not violate Title Nine because

> [a]lthough [mother] left the hospital and did not return, [mother] left [child] in a hospital where she was undoubtedly well taken care of and her needs were met. Nothing in the facts suggest that [mother's] actions impaired [child] or put [child] in imminent danger of being impaired while she remained in the safety of the hospital's care.
>
> [Id. at 366.]

As in B.P., nothing in the record suggests that Natalie's actions impaired Caleb or put him in imminent danger of being impaired while he was in the safety of the police and the Division's care. Ibid. Neither the Division, the Law Guardian, nor the trial court provide any facts to support the imminent dangers that Caleb faced from Natalie's actions. The "mere possibility" of impairment is not enough to prove abuse or neglect. Id. at 379.

While we agree with the trial court that "leaving [Caleb] with the police and refusing to allow him to return to the home, causing the Division to assume custody of him[,] [was] not an appropriate way to handle a difficult child[,]" we

13

find that that the evidence the Division presented in this case was insufficient for a finding of abuse or neglect under the Court's holding in <u>B.P.</u>

Because we find that there was insufficient evidence to prove Natalie's abuse or neglect of Caleb, we need not reach Natalie's hearsay arguments. We vacate the trial court's order and direct the Division to remove Natalie's name from the Child Abuse Registry.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-2334-23