# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3452-24

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

I.L., [1]

     Defendant-Appellant,

and

A.Z.,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF A.L.Z.
and G.L.Z., minors.

_____

Argued February 24, 2026 – Decided March 24, 2026

---

[1] We refer to the parties and the children by initials and fictitious names to protect their privacy. R. 1:38-3(d)(12).

Before Judges Firko and Vinci.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Ocean County, Docket No. FG-15-0004-25.

Ryan T. Clark, Designated Counsel, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Ryan T. Clark, on the briefs).

Lakshmi Barot, Deputy Attorney General, argued the cause for respondent (Jennifer Davenport, Attorney General, attorney; Janet Greenberg Cohen, Assistant Attorney General, of counsel; Lakshmi Barot, on the brief).

Jennifer M. Sullivan, Assistant Deputy Public Defender, argued the cause for the minors A.L.Z. and G.L.Z. (Jennifer N. Sellitti, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Jennifer M. Sullivan, of counsel and on the brief).

PER CURIAM

Defendant I.L., the biological mother of A.L.Z. (Alex) and G.L.Z. (Grace), appeals from a June 13, 2025 judgment of guardianship terminating her parental rights (TPR) to the children.[2] Defendant contends the Division of Child Protection and Permanency (Division) failed to prove prongs two, three, and

---

[2] The children's biological father, defendant A.Z., whose parental rights were also terminated, cannot be located and did not participate in this appeal.

four of N.J.S.A. 30:4C-15.1(a). Defendant also contends the judge improperly relied on "uncorroborated child hearsay."

Based on our review of the record and applicable law, we are satisfied the record evidence supports the decision to terminate defendant's parental rights by clear and convincing evidence. Accordingly, we affirm substantially for the reasons set forth by Judge Deborah Hanlon-Schron in her thorough and well-reasoned oral opinion. We will not recite in detail the history of the Division's interactions with defendant. Instead, we incorporate by reference the factual findings and legal conclusions contained in the judge's opinion. We add the following comments.

I.

Alex was born in January 2012 and Grace in September 2013. Alex was diagnosed with cerebral palsy, requires specialists to manage his condition, and uses a wheelchair because he is unable to walk. The Division's involvement with defendant began in 2014. There were various referrals over the years relating to alleged domestic violence, defendant's mental health, alleged physical abuse, an allegation that defendant locked Grace out of the house, and general parenting concerns. The referrals were not substantiated but led to the Division arranging for the Ocean Partnership for Children (OPC) to provide in-

home therapy for Alex. The Division also arranged counseling for defendant to improve her parenting skills.

On June 21, 2023, Alex, who was eleven years old, reported to his OPC case manager, John Lowden, that defendant was emotionally and sexually abusing him, engaging in other sexually inappropriate conduct with both children, and showing the children pornography. Specifically, Alex told Lowden defendant was "starting to say negative things to him again" like that "[defendant] wishes [he] was not born and . . . wishes [he] was not alive." He disclosed that "a few months prior" defendant started "kissing his . . . penis." "[H]is mom would kiss it, and then also put her mouth around his penis" and "plucked his pubic hairs." Defendant also kissed his butt and showed the children "[p]ornographic stuff."

Alex stated "his mother ha[d] shown him and his sister her vagina." He reported defendant made him feel uncomfortable because she "would describe his penis to her friends." Alex also reported that in September 2022 there was "an incident between [defendant's] boyfriend and [Grace]" where the boyfriend "put his hand on [Grace's] breast over her clothes" and "took a selfie." Lowden reported the allegations and the Division contacted the Ocean County Prosecutor's Office (OPD).

An OPD detective and Division caseworker Courtney Skibniewski responded to the residence and escorted the family to a child advocacy center to be interviewed. They were accompanied by E.W., a family friend who lived with the family and had cared for the children for several years. E.W. is known to the children as "Auntie E." During their interviews, the children made disclosures consistent with Alex's report to Lowden and E.W. corroborated certain allegations.

Defendant was arrested and charged with aggravated sexual assault, sexual assault, and endangering the welfare of children. On July 12, 2023, the judge granted the Division custody of the children, and they were placed with E.W., with whom they have lived since that time. The judge prohibited defendant from having contact with the children, a restriction the criminal court later implemented as well. Defendant has been incarcerated in the Ocean County Jail since she was arrested.[3]

On September 5, 2023, the children were evaluated at the Dorothy B. Hersch Regional Child Protection Center, a diagnostic and treatment center for children and families affected by abuse and neglect. Alex reported having

---

[3] At oral argument before us, counsel reported defendant's first trial ended in a mistrial and she is awaiting retrial, which is currently scheduled for May 2026.

nightmares about "his mother breaking out of jail." Alex stated defendant would tell him he was a "useless invalid and idiot." He reiterated that defendant "put her mouth around [his] private part" while bathing him and "kiss[ed] it." She would tell her boyfriend to look at Alex's penis, and tell him "my son[']s penis will be as big as his dad[']s." Alex also reported witnessing defendant in "numerous" sexual acts with various men, and that one of her former boyfriends attempted to touch his "private part."

Grace, who was ten years old, reported that defendant's boyfriend touched her breast over her clothing at her ninth birthday party and touched her on the leg on another occasion. Grace also reported defendant would expose her vagina to her and her brother and ask them if they wanted to "go back where [they] came from." Defendant taught Grace how to masturbate because she had "to learn how to satisfy a man." Grace also reported defendant showed her pornography. Like Alex, Grace stated she had "bad dreams." Both children said they were afraid of being taken from E.W.'s care.

After defendant was incarcerated, the Division continued to provide services to the children, including in-home therapy through OPC. Additionally, Grace was approved for a psychiatric evaluation, short-term counseling, and a long-term counseling program through St. Francis Counseling Services (St.

6

Francis). Alex was also approved for counseling through St. Francis, as well as physical and occupational therapy.

The Division determined the allegations of sexual abuse and sexual penetration as to Alex and sexual abuse and sexual exploitation as to Grace were substantiated. On September 10, 2024, the Division filed its guardianship complaint. The judge conducted a two-day guardianship trial in June 2025. The Division presented testimony from Lowden, Skibniewski, Division caseworker Alyson Simak, and E.W. Defendant did not testify or present any witnesses or evidence.

Lowden testified he began working with Alex and defendant in September 2022. He described Alex's June 2023 disclosure to him as stated. Before defendant's arrest, Lowden observed E.W. in the home and described her as "motherly" and "very caring and nurturing." Since defendant has not lived with the children, Lowden observed "[t]hey[ are] more positive" and Alex "has more self-esteem."

Lowden testified the children "like [E.W.] like a mom. . . . They[ are] nurturing towards her, she[ is] nurturing towards them. They show affection to each other." E.W. "goes above and beyond. . . . [S]he[ is] one of the most organized guardians of kids [Lowden had] worked with. She keeps notes on

everything." E.W. makes sure Alex's orthopedic, neurologist, medication, and transportation needs are met. She also makes sure Grace's orthopedic needs are met and that both children attend scheduled therapy. Lowden testified that the children do not ask about defendant and "[t]hey say they do[ not] want to go back to [defendant] and they want [E.W.] to adopt them."

Simak testified that she was assigned to this case in August 2024. She explained due to defendant being incarcerated "the majority of the services that were provided were . . . provided directly to the children." She could not arrange visitation with defendant due to the criminal and family court no contact orders, and defendant refused to participate in a psychological evaluation on the advice of her criminal counsel and declined the Division's offer of counseling services. Simak would meet defendant monthly to provide her with updates on the children. Defendant asked Simak "a couple times about how the kids [were] doing."

Simak testified that "[t]he kids are very comfortable with [E.W.] . . . [S]he provides all their needs and wants and advocates for them on what she feels that they could benefit from." E.W. "makes sure that whatever these kids need, they get. And if she feels that they[ are] not getting enough services, she will go up the chain through the programs to . . . advocate for them to get more."

Simak testified the children want to live with E.W. and be adopted by her. The children "do[ not] really want to discuss" defendant and do not ask about her. E.W. is "very committed to them," has been "a consistent figure in their life," and wants to adopt them. Simak discussed the differences between kinship legal guardianship (KLG) and adoption with E.W., and she "knows the difference" and wants to adopt the children.

Simak testified that the Division assessed additional relatives as possible placement options, but they were not approved. "Several" of the individuals lived "out[]of[]state" or in "Europe." The Division sent numerous relatives "best interest[s] letters" denying placement with them because the Division "determin[ed] that it would be in the best interest[s] of the children to remain [with E.W.] because [Alex] and [Grace were] currently placed in fictive kin and the children [were] doing well. They [were] stable and bonded with the relative resource home." None of the relatives who received the letters thereafter contacted the Division.

E.W. testified that she was introduced to the family through the children's maternal grandmother and began living with them in February 2014 to help defendant with the children. She lived with the family until June 2014. A month later, E.W. returned to the home because Alex needed back surgery. E.W.

9

testified she has been living with the children ever since and has been the children's primary caretaker.

E.W. testified she had concerns regarding defendant's parenting because "at times it was[ not] like a mother kids relationship. [Defendant] snapped at them, she called them names." Defendant would tell the children "they were all mistakes, she did[ not] want them." E.W. also testified:

> [E.W.:] I saw [Grace] doing something to herself that she should[ not] have been doing and I asked her . . . why did you start doing this now? She said mom taught her how to use her two fingers and rub herself because it makes her feel good.
>
> [DIVISION:] Okay. How about [Alex]?
>
> [E.W.:] With [Alex], I caught [defendant] in the bed with [Alex] and he was watching Pornhub on an iPad.
>
> [DIVISION:] Okay. And was [defendant] awake, did she realize he was watching it?
>
> [E.W.:] Yes.
>
> [DIVISION:] Okay. And what did you do at that point?
>
> . . . .
>
> [E.W.:] I just asked her why is she teaching the kids Pornhub, and it was, well, he[ has] got to learn somehow.

A-3452-24

E.W. testified defendant offered to sell the children to her for $10,000 and the children heard her say that. E.W. also testified:

[E.W.:] Whenever [defendant] bathed [Alex] she always, . . . touch[ed] his penis and sa[id] things, like, you[ are] going to be just like your dad, things of that sort. And [E.W.] always . . . let her know she should[ not] be doing it.

[DIVISION:] Okay. Did she ever do anything else to his genital area?

[E.W.:] I saw her once literally kissing him but I could not tell whether the penis was in her mouth or not, but she was kissing him there.

E.W. testified defendant told Grace that she does not love her "because [she] d[id not] have any social security like [her] brother. . . . [She was] a mistake and just do[ not] even call [her] mom." E.W. had called referrals into the Division and had even called the Division in front of defendant because "every time [E.W.] t[old defendant not] to do something she repeat[ed] doing it all the time." In response, she would receive "the same letter stating that the case was closed."

E.W. testified she manages the children's schedules, advocates for them when dealing with service providers, and treats the children as though they are hers. She testified the children "keep begging [her] to adopt them" and they "do[ not] want to go back to" defendant. They "[v]ery seldom" speak about

11

defendant. The Division explained KLG and adoption to her and she understood the differences. E.W. believes adoption would be in the children's best interests.

On June 13, 2025, the judge rendered her comprehensive oral opinion finding the Division proved by clear and convincing evidence all four prongs of N.J.S.A. 30:4C-15.1(a) and entered an order terminating defendant's parental rights. This appeal followed.

## II.

Our "scope of review on appeals from orders terminating parental rights is limited." N.J. Div. of Child Prot. & Permanency v. M.M., 459 N.J. Super. 246, 256 (App. Div. 2019). We review the trial court's factual findings "in accordance with a deferential standard," N.J. Div. of Child. Prot. & Permanency v. D.C.A., 256 N.J. 4, 19 (2023), and its findings "generally should be upheld so long as they are supported by 'adequate, substantial, and credible evidence.'" M.M., 459 N.J. Super. at 256 (quoting N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014)). We defer to the factual findings of the family court due to that court's special expertise in family matters and the limitations of reviewing a cold record. See N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012). "We will not overturn a family court's fact[ ]findings unless they are so 'wide of the mark' that our intervention is necessary to correct

an injustice." Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)) (internal quotation marks omitted).

Having reviewed the record, we rely upon the judge's findings, which are all supported by substantial credible evidence. We also agree with the judge's legal conclusions regarding all four prongs of N.J.S.A. 30:4C-15.1(a). Accordingly, we address only defendant's arguments regarding prongs two, three, and four, and her claim the judge relied on uncorroborated hearsay statements of the children.

### III.

### A.

The "second prong of the statutory standard relates to parental unfitness." In re Guardianship of K.H.O., 161 N.J. 337, 352 (1999). The Division must prove by clear and convincing evidence "[t]he parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm." N.J.S.A. 30:4C-15.1(a)(2).

To satisfy prong two, the Division "must show not only that the child's health and development have been and continue to be endangered, but also that the harm is likely to continue because the parent is unable or unwilling to

A-3452-24

overcome or remove the harm." K.H.O., 161 N.J. at 348. "That inquiry is aimed at determining whether the parent has cured and overcome the initial harm that endangered the health, safety, or welfare of the child, and is able to continue a parental relationship without recurrent harm to the child." Ibid. This requirement closely interrelates with prong one. See In re Guardianship of DMH, 161 N.J. 365, 379 (1999) ("While the second prong more directly focuses on conduct that equates with parental unfitness, the two components of the harm requirement, N.J.S.A. 30:4C-15.1(a)(1) and (2)[,] are related to one another, and evidence that supports one informs and may support the other"). "Alternatively . . . it may be shown that the parent is unable to provide a safe and stable home for the child and that the delay in securing permanency continues or adds to the child's harm." KHO, 161 N.J. at 348-49.

Here, the judge found the Division proved prong two by clear and convincing evidence because:

> [Defendant] is unable to eliminate the harm at this time and . . . the [c]ourt has the right to look at the history of [defendant] with these children. There has been an ongoing inability to effectively parent. The parenting style that was testified to in this matter demonstrates to the [c]ourt that this is parental unfitness. This defendant said on innumerable occasions how she hated her children and she wishes they were dead, she wanted to sell them[,] and she told them that they were all mistakes. It is not . . . reasonably foreseeable that she

14

can overcome the harm that was brought to these children in addition to the sexual abuse. At the time that she was making these statements to the children she was involved in parenting classes and, in addition, it has been two years. The children have been with . . . [E.W.] the entire time.

These children are entitled to permanency because the future of [defendant] is unknown at this time, and it is unknown regardless of what the outcome of the criminal charges is. There[ is] nothing that[ has] been said to the [c]ourt that if there was a guilty finding what would happen, and if she was subsequently found not guilty of the charges whether that would automatically generate a relationship with . . . the children and [the court] can[not] make that finding based upon her history that was presented during the course of this trial.

And keeping [the children] in limbo, hoping that there will be a magical, significant change in the defendant's attitude towards the children in this [c]ourt's view would be a misapplication of the law.

Defendant's claim that the court relied on "incarceration[] standing alone" in violation of our Supreme Court's decision in R.G. is misplaced. In R.G., the defendant "father was incarcerated [for eluding a police officer and a violation of probation] six months after the birth of his daughter" and "was released . . . while a guardianship trial was in progress." 217 N.J. at 535. The defendant testified at trial and "presented evidence that he effectively parented [his child] during the first six months of her life," and "called and wrote to [the

15

child] while in prison." Id. at 560-61. The defendant testified that "he desired to maintain a relationship with [the child] and 'be part of [her] life.'" Id. at 541. He also testified that "immediately preceding the hearing, [the child] told [him] . . . she loved him and looked forward to spending time with him in the future." Id. at 564.

While the defendant was incarcerated "[t]he Division visited [him] once in prison and called him on one other occasion to determine his date of release." Id. at 562. It "arranged two psychological evaluations . . . but never arranged a bonding evaluation between" him and the child. Ibid. The Division "failed to provide [him] with letters" from the child and "never provided [him] with assistance in telephoning" his child. Ibid. "[D]espite knowing that [he] was participating in prison programs and was scheduled to be released from prison shortly after trial, the Division never . . . attempted to schedule service upon [his] release." Id. at 562-63.

Under those circumstances, the Court determined the Division failed to prove prongs two and three. Id. at 561-63. The Court "note[d] that in circumstances such as these, particularly when an incarcerated parent's release is imminent . . . and the incarcerated parent has expressed a willingness to improve [their] parenting skills and a desire to deepen [their] parent-child

16

relationship, the Division must do more than merely speak with the parent and provide two psychological evaluations." Id. at 563.

In this case, unlike in R.G., defendant failed to produce any evidence that she effectively parented the children before she was incarcerated, desired to maintain a relationship with them, or that they desire to maintain a relationship with her. Instead, the evidence the Division produced at trial indicated she was not an effective parent prior to her incarceration, has not expressed a desire to maintain a relationship with the children, and the children do not desire to maintain a relationship with her. Moreover, unlike in R.G., defendant's release from prison is not imminent.

Contrary to defendant's claim, the judge did not base her prong two analysis on "incarceration[] standing alone." We are satisfied the judge's determination is amply supported by the record and she correctly determined the Division satisfied prong two by clear and convincing evidence.

B.

Prong three, N.J.S.A. 30:4C-15.1(a)(3), requires the Division to demonstrate reasonable efforts to reunite the family and the court to "consider[] alternatives to termination of parental rights." The Division's efforts must be analyzed "with reference to the circumstances of the individual case," including

17

the parent's degree of participation. DMH, 161 N.J. at 390. Courts do not measure reasonableness by the "success" of the efforts. N.J. Div. of Youth & Fam. Servs. v. J.S., 433 N.J. Super. 69, 90 (App. Div. 2013) (quoting DMH, 161 N.J. at 393).

Pursuant to N.J.S.A. 30:4C-15.1(a)(3), "KLG is considered an alternative to termination of parental rights that offers permanency and stability to a child residing with a relative or kinship caregiver." N.J. Div. of Child Prot. & Permanency v. D.A., 477 N.J. Super. 63, 82-83 (App. Div. 2023). "The decision of a resource parent to choose adoption over KLG must be an informed one," M.M., 459 N.J. Super. at 260, and must be "unconditional, unambiguous, and unqualified." Id. at 264.

Once the caregiver is provided information regarding the benefits and burdens of a KLG, the caretaker's preference between the two alternatives "should matter." Id. at 263. Moreover, neither the Division nor the trial court may force a resource parent or relative to become a KLG. See D.C.A., 256 N.J. at 24 n.8 ("When a court orders KLG, the child is placed with a caregiver with whom the child has a kinship relationship and 'who is willing to assume care of a child due to parental incapacity, with the intent to raise the child to adulthood'" (quoting N.J.S.A. 3B:12A-2)).

As to prong three, the judge found:

> while the Division was very limited in their ability to make efforts to assist [defendant], the Division took substantial steps and made substantial reasonable efforts, in this [c]ourt's view, to provide services to the children which could, in turn, foster the reunification effort towards the parent.
>
> So, on that basis, [the court is] satisfied by clear and convincing evidence that the Division explored alternatives, that they made a determination that the best interest[s] of the children were met by the kin placement that the children had been in from the absolute beginning of the case, and that [KLG] was discussed with the resource parent. She did not want to do [KLG], no one can force an individual to do [KLG], and there is no one else standing in the wings who has come forward affirmatively for these children.

We are unpersuaded by defendant's claim, again based on R.G., that the Division failed to "provide detention-compatible reunification services." The Division established it met with defendant monthly, offered to conduct a psychological evaluation, and offered to provide counseling. Defendant rejected the Division's offer of a psychological evaluation on the advice of her criminal counsel and refused the Division's offer of counseling. Defendant's claim that the Division should have facilitated contact with the children lacks merit because of the no contact orders entered by the family and criminal courts. Defendant's claim that the Division should have "coordinated with jail staff to

stage reentry services" and scheduled "services for the immediate post-release period" lacks merit. Defendant does not have an anticipated release date and, unlike in R.G., her release is not imminent.

Defendant's claim that the Division failed to conduct a "genuine, merits-based exploration of relatives and less restrictive permanency options," such as KLG, is belied by the record. The Division thoroughly explored the possibility of placement with every person identified by the Division or defendant, and determined they were not appropriate placement options. Not one of the individuals contacted the Division after being informed of that determination. Moreover, defendant does not identify any individual who the Division failed to consider or who is willing and able to care for the children. The judge also appropriately considered KLG and E.W.'s desire to adopt the children. The judge's determination that the Division proved prong three by clear and convincing evidence is supported by substantial evidence in the record.

C.

Prong four requires the court to determine whether TPR "will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). "[T]he fourth prong 'serves as a fail-safe against termination even where the remaining standards have been met.'" R.G., 217 N.J. at 559 (quoting E.P., 196 N.J. at 108). "The question is

'not whether a [birth] mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with that parent.'" Ibid. (alteration in original) (quoting E.P., 196 N.J. at 108).

This analysis "cannot require a showing that no harm will befall the child as a result of the severing of biological ties." K.H.O., 161 N.J. at 355. Instead, "[t]he question . . . is whether, after considering and balancing the two relationships, . . . child[ren] will suffer a greater harm from the termination of ties with [their] natural parents than from the permanent disruption of [their] relationship with [the] foster parents." Ibid. Courts have "long considered a child's relationship with a resource family . . . when [it] applie[s] the fourth prong." D.C.A., 256 N.J. at 23.

Vital under prong four is consideration of "[a] child's need for permanency." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 281 (2007) (citing K.H.O., 161 N.J. at 357-58). "Ultimately, a child has a right to live in a stable, nurturing environment and to have the psychological security that his [or her] most deeply formed attachments will not be shattered." F.M., 211 N.J. at 453. Critically, children should not "languish indefinitely" in a resource placement while a parent attempts to correct parenting difficulties. N.J. Div. of Youth & Fam. Servs. v. S.F., 392 N.J. Super. 201, 209 (App. Div. 2007).

21

Based on our review of the record, we are convinced the judge correctly applied prong four and determined termination of parental rights would not do more harm than good.

The judge determined the Division proved prong four by clear and convincing evidence because:

> Everyone who has been involved in this matter, [Lowden], the Division workers, the resource parent, have all testified that the children are happy, safe, and engaged in their current placement. The children are being provided with every possible service that they need and the resource parent continues to fight for any additional services that she believes necessary. She is committed to meeting all of the needs for [Alex] and [Grace] going forward.
>
> Before the disclosure of [Alex] with regard to sexual abuse, there was a dearth of the relationship between the defendant and her children. They were subject to emotional abuse. They were subject to verbal abuse. She was given assistance through programs and did[ not] take advantage of that, and [the court] can[ not] stress this enough, [defendant] was willing to sell her children for a price.

We are unconvinced by defendant's claim that "comparative-bond evidence was indispensable and missing." "The necessity of expert testimony is determined by the sound exercise of discretion by the trial judge." Maison v. N.J. Transit Corp., 460 N.J. Super. 222, 232 (App. Div. 2019) (citing State v. Summers, 350 N.J. Super. 353, 364 (App. Div. 2002), aff'd, 176 N.J. 306

(2003)).  See also New Jersey Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 182 (2010) (finding expert testimony based on a comparison of bonding evaluations is not required in an instance involving a "common sense notion that [a] child will be more bonded with his [or her resource] parents than with [the] defendant").

Here, the judge determined expert testimony was not required because it would not "have yielded anything that was[ not] already in the record."  Indeed, given the serious allegations of sexual abuse at issue and the no contact orders in place combined with defendant's refusal to participate in psychological evaluations on the advice of her criminal counsel, we are satisfied the judge correctly determined expert testimony would not have yielded additional information.  There is no reason for us to conclude the judge misapplied her discretion by determining expert testimony was not required in this case.  The judge's findings are supported by competent evidence in the record and she correctly determined that the Division proved prong four by clear and convincing evidence.

D.

Defendant's claim that the judge improperly relied on uncorroborated hearsay statements of the children is without merit. N.J.S.A. 30:4C-15.1a provides, in pertinent part:

> a. Previous statements made by a child relating to any allegations of abuse or neglect of that child shall be admissible in evidence in any hearing: to terminate parental rights.

> b. No such statement, if uncorroborated, shall be sufficient to make a determination that termination of parental rights is in the best interests of the child, or to make a fact finding of abuse or neglect.

Applying similar provisions set forth in N.J.S.A. 9:6-8.46, we have concluded corroboration requires "[s]ome direct or circumstantial evidence beyond the child's statement itself." N.J. Div. of Child Prot. & Permanency v. N.B., 452 N.J. Super. 513, 522 (App. Div. 2017). The corroborative evidence need not exactly mirror the child's abuse allegations. N.J. Div. of Youth & Family Servs. v. L.A., 357 N.J. Super. 155, 166 (App. Div. 2003). Instead, "corroborative evidence 'need only provide support for the out-of-court statements.'" Ibid. (quoting N.J. Div. of Youth & Family Servs. v. Z.P.R., 351 N.J. Super. 427, 436 (App. Div. 2002)).

A-3452-24

In this case, the children's allegations of sexual abuse and exploitation were corroborated by E.W.'s testimony that she witnessed defendant engaging in certain of the alleged sexual conduct. The judge found E.W.'s testimony "to be quite credible." E.W.'s credible eyewitness testimony is plainly sufficient to satisfy the corroboration requirement of N.J.S.A. 30:4C-15.1a.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

25

A-3452-24